No. 25-11303

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS; OGLE SCHOOL MANAGEMENT, L.L.C.; TRICOCI UNIVERSITY OF BEAUTY CULTURE, L.L.C.; DUVALL'S SCHOOL OF COSMETOLOGY, L.L.C.,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, Secretary, U.S. Department of Education, in her official capacity,

*Defendants-Appellees*.

(*caption continued on inside cover*)

On Appeal from the United States District Court
for the Northern District of Texas,
Nos. 4:23-CV-1267, 4:24-CV-259

## BRIEF FOR PLAINTIFFS-APPELLANTS OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC; AND AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS

PAUL D. CLEMENT
 *Counsel of Record*
ANDREW C. LAWRENCE
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellants Ogle School Management LLC; Tricoci University of Beauty Culture, LLC; and American Association of Cosmetology Schools*

March 23, 2026

OGLE SCHOOL MANAGEMENT, L.L.C.; TRICOCI UNIVERSITY OF
BEAUTY CULTURE, L.L.C.,

*Plaintiffs-Appellants*

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, Secretary, U.S.
Department of Education, in her official capacity,

*Defendants-Appellees.*

# CERTIFICATE OF INTERESTED PERSONS

(1)     Case No. 25-11303:  *American Association of Cosmetology Schools et. al. v. United States Department of Education et al.*

(2)     The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- All institutions of higher learning that receive funds under Title IV of the Higher Education Act

- Abhishek Kambli

- Andrew C. Lawrence

- Christin Jeffrey Jones

- Clement & Murphy PLLC

- Cole B. Ramey

- Drew Thomas Dorner

- Duane Morris LLP

- DuVall's School of Cosmetology, L.L.C.

- Edward M. Cramp

- Johan G. Joakim Soederbaum

- John M. Simpson

- Joshua Divine

- Kathryn Wyer

- Kevin Joseph Wynosky

- Kilpatrick Townsend & Stockton LLP

- Linda McMahon, in her official capacity as Secretary of the U.S. Department of Education

- Monroe David Bryant, Jr.

- Munera Al-Fuhaid

- Paul D. Clement

- Sean Janda

- State of Alabama

- State of Indiana

- State of Kansas

- State of Missouri

- State of Montana

- State of Texas

- State of Utah

- State of South Carolina

- U.S. Department of Education

- U.S. Department of Justice

(3)     Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel of record certifies that Ogle School Management LLC's parent company is RLJ-Ogle Schools Operations, Inc.  Tricoci University of Beauty Culture, LLC's parent company is TUBC Holdings, LLC.  The American Association of Cosmetology Schools does not have a parent company.  No publicly held corporation owns 10% or more of Ogle or Tricoci's stock.  The American Association of Cosmetology Schools is a membership organization that does not issue stock.

s/Paul D. Clement
Paul D. Clement
 *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellants Ogle School Management LLC; Tricoci University of Beauty Culture, LLC; and American Association of Cosmetology Schools*

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellants Ogle School Management, LLC, Tricoci University of Beauty Culture, LLC, and American Association of Cosmetology Schools respectfully request oral argument. This appeal concerns a rule promulgated by the Department of Education that is anticipated to fundamentally alter vocational education generally and the cosmetology sector in particular. Plaintiffs-Appellants respectfully submit that oral argument would assist the Court in resolving the important issues presented.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................................. iv

TABLE OF AUTHORITIES .................................................................................. vii

INTRODUCTION ................................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................................... 5

STATEMENT OF THE ISSUES ............................................................................. 5

STATEMENT OF THE CASE ................................................................................. 5

    A.    Historical & Statutory Background .......................................... 5

    B.    Regulatory Background ...........................................................11

    C.    The Challenged 2023 Rule ..................................................... 19

    D.    Procedural History ................................................................. 24

SUMMARY OF ARGUMENT .............................................................................. 25

STANDARD OF REVIEW ................................................................................... 27

ARGUMENT ........................................................................................................ 28

I.    The Department's Interpretation Of The HEA's "Gainful Employment" Language Is Inconsistent With The Statute ........................... 28

    A.    The "Gainful Employment" Language Is Not A Font For Various Atextual Requirements Having Little To Do With Whether A Vocational Training Program Prepares Students For Gainful Employment ...................................................... 28

    B.    The District Court's Contrary View Is Plainly Wrong ...................... 40

II.    The Department's Action Is Arbitrary And Capricious .............................. 44

    A.    The Department Is Illogically Relying on Concededly Inaccurate Earnings Data ................................................. 45

B.    The Department's Earnings-Based Tests Illogically Penalize Schools for Factors Beyond Their Control ......................................... 49

C.    The Department Is Relying on Illogical Debt-to-Earnings Thresholds ................................................................................. 53

D.    The Department's Cost-Benefit Analysis Is Illogical ........................ 56

CONCLUSION ........................................................................................ 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*AACS v. DeVos*,
No. 17-cv-263 (D.D.C. filed Feb. 10, 2017) ......................................................15

*AACS v. DeVos*,
258 F.Supp.3d 50 (D.D.C. 2017) ...................................................... 15, 46, 47

*APSCU v. Duncan*,
870 F.Supp.2d 133 (D.D.C. 2012) ...................................................................14

*APSCU v. Duncan*,
110 F.Supp.3d 176 (D.D.C. 2015) ...................................................................15

*Ass'n of Proprietary Colls. v. Duncan*,
107 F.Supp.3d 332 (S.D.N.Y. 2015) ...............................................................15

*Biden v. Nebraska*,
600 U.S. 477 (2023) .........................................................................................38

*Biden v. Texas*,
597 U.S. 785 (2022) .........................................................................................35

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
62 F.4th 905 (5th Cir. 2023) ............................................................................55

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) .........................................................................54

*CCST v. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ............................................................................54

*Chamber of Com. v. DOL*,
885 F.3d 360 (5th Cir. 2018) ...................................................... 43, 47

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) ............................................................................56

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .........................................................................................54

*FCC v. Prometheus Radio Project,*
 592 U.S. 414 (2021)...................................................................44

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
 968 F.3d 454 (5th Cir. 2020)...................................................44

*Horn v. State Farm Lloyds,*
 703 F.3d 735 (5th Cir. 2012)...................................................29

*Inhance Techs., L.L.C. v. EPA,*
 96 F.4th 888 (5th Cir. 2024)...................................................28

*Jama v. ICE,*
 543 U.S. 335 (2005)...................................................................35

*Kovac v. Wray,*
 109 F.4th 331 (5th Cir. 2024).................................................32

*Loper Bright Enters. v. Raimondo,*
 603 U.S. 369 (2024)........................................................ *passim*

*MCR Oil Tools, L.L.C. v. DOT,*
 110 F.4th 677 (5th Cir. 2024).................................................49

*Mexican Gulf Fishing Co. v. Dep't of Com.,*
 60 F.4th 956 (5th Cir. 2023)........................................... 53, 56

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.*
 *v. State Farm Mut. Auto. Ins.,*
 463 U.S. 29 (1983).....................................................................55

*New Prime Inc. v. Oliveira,*
 586 U.S. 105 (2019)............................................................ 6, 42

*NFIB v. OSHA,*
 595 U.S. 109 (2022)...................................................................38

*Rest. L. Ctr. v. DOL,*
 120 F.4th 163 (5th Cir. 2024).................................................27

*Russello v. United States,*
 464 U.S. 16 (1983).....................................................................34

*Sekhar v. United States,*
    570 U.S. 729 (2013)..................................................................................52

*State v. Biden,*
    10 F.4th 538 (5th Cir. 2021)....................................................................57

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019)........................................................... 47, 51

*United States v. Koutsostamatis,*
    956 F.3d 301 (5th Cir. 2020)....................................................................35

*United States v. Lopez-Valenzuela,*
    511 F.3d 487 (5th Cir. 2007)....................................................................33

*United States v. Santos,*
    553 U.S. 507 (2008)..................................................................................33

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
    985 F.3d 472 (5th Cir. 2021)....................................................................45

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023)....................................................................29

*Waetzig v. Halliburton Energy Servs., Inc.,*
    604 U.S. 305 (2025)..................................................................................28

*West Virginia v. EPA,*
    597 U.S. 697 (2022)..................................................................................38

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
    586 U.S. 9 (2018)......................................................................................41

**Statutes**

5 U.S.C. §706(2) ...........................................................................................28

20 U.S.C. §1002(a) .......................................................................................29

20 U.S.C. §1002(b)(1)........................................................................11, 25, 32

20 U.S.C. §1002(b)(1)-(2) ............................................................................11

20 U.S.C. §1002(b)(2)....................................................................................34

20 U.S.C. §1002(c)(1)............................................................32

20 U.S.C. §1002(c)(2)............................................................34

20 U.S.C. §1002(c)(1)-(2)........................................................11

20 U.S.C. §1015a(k)(D)..........................................................35

20 U.S.C. §1036(e)(1)............................................................36

20 U.S.C. §1085(a)(2)............................................................34

20 U.S.C. §1085(b)(iv)..........................................................34

20 U.S.C. §1085(b)-(c) (1992)....................................................9

20 U.S.C. §1085(c) (1970)........................................................9

20 U.S.C. §1085(m)(1)...........................................................34

20 U.S.C. §1085(o)(2)...........................................................35

20 U.S.C. §1087d(c).............................................................33

20 U.S.C. §1087d(c)(5)..........................................................49

20 U.S.C. §1087dd(e)(1).........................................................34

20 U.S.C. §1088(b)(1)......................................................11, 25, 29

20 U.S.C. §1088(b)(1) (1994).....................................................10

20 U.S.C. §1088(b)(2)...........................................................38

20 U.S.C. §1088(b)(5) (1994).....................................................10

20 U.S.C. §1088(b)-(c) (1994)..................................................9, 10

20 U.S.C. §1088(c)(1) (1994).....................................................10

20 U.S.C. §1088(c)(3) (1994).....................................................10

20 U.S.C. §1088(e)(1) (1994).....................................................10

20 U.S.C. §1094(c)(1)...........................................................43

20 U.S.C. §1098bb(a)(2)...................................................................................52

20 U.S.C. §1098e(b)(7)....................................................................................35

20 U.S.C. §1098ee(4).......................................................................................52

20 U.S.C. §1099c(a)..........................................................................................29

20 U.S.C. §1099c(d)(2).....................................................................................43

20 U.S.C. §1134c(a)..........................................................................................36

20 U.S.C. §1135c(d)(2).....................................................................................36

20 U.S.C. §1161g(d)(5) ....................................................................................36

28 U.S.C. §1291..................................................................................................5

28 U.S.C. §1331..................................................................................................5

Pub. L. No. 102-325, 106 Stat. 448 (1992)........................................................9

Pub. L. No. 110-315, 122 Stat. 3078 (2008)....................................................11

Pub. L. No. 64-347, 39 Stat. 929 (1917)...................................................... 6, 39

Pub. L. No. 78-346, 58 Stat. 284 (1944)............................................................6

Pub. L. No. 85-864, 72 Stat. 1580 (1958)..................................................... 7, 39

Pub. L. No. 89-287, 79 Stat. 1037 (1965)..........................................................8

Pub. L. No. 89-329, 79 Stat. 1219 (1965)..................................................... 7, 36

Pub. L. No. 90-575, 82 Stat. 1014 (1968)......................................................8, 9

Pub. L. No. 92-318, 86 Stat. 235 (1972)..........................................................39

**Regulations and Rule**

34 C.F.R. §600.2 ..............................................................................................42

34 C.F.R. §668.8(g)(1)......................................................................................39

75 Fed. Reg. 43,616 (July 26, 2010)................................................................13

76 Fed. Reg. 34,386 (June 13, 2011) ...................................................... 12, 14, 45, 46

79 Fed. Reg. 16,426 (Mar. 25, 2014) ...................................................................53

79 Fed. Reg. 64,890 (Oct. 31, 2014)........................................................ 14, 15, 46

83 Fed. Reg. 40,167 (Aug. 14, 2018) ...................................................................16

84 Fed. Reg. 31,392 (July 1, 2019)............................................................. *passim*

88 Fed. Reg. 32,300 (May 19, 2023) ............................................................ 19, 53

88 Fed. Reg. 70,004 (Oct. 10, 2023)........................................................... *passim*

Fed. R. App. P. 4(a)(B).........................................................................................5

**Other Authorities**

American Heritage Dictionary of the English Language (1969)............................30

Black's Law Dictionary (12th ed. 2024) ........................................................ 30, 42

*Cambridge Dictionary* (online ed.).....................................................................30

*Collins Dictionary* (online ed.) ...........................................................................30

Complaint, *APSCU v. Duncan*,
No. 11-cv-1314 (D.D.C. filed July 20, 2011), Dkt.1 .........................................14

Cory Smith, *Federal education officials take aim on student debt from
for-profit colleges*, ABC-7 (May 18, 2023) ......................................................19

David Carleton, *Landmark Congressional Laws on Education* (2002) ............. 5, 39

Defendants' Cross-Motion for Summary Judgment,
*APSCU v. Duncan*, No. 14-cv-1870
(D.D.C. filed Mar. 6, 2015), Dkt.18 ............................................................ 6, 10

Dep't of Educ., *GE Data3*—Dataset*, Regulations.gov
(June 2, 2023), https://perma.cc/NH25-Z3BX ................................................23

Dep't of Educ., *Electronic Announcement ID: General-24-74*
(June 20, 2024), https://rb.gy/nwwgs3 ...........................................................21

Dep't of Educ., *Federal Role in Education*,
    https://perma.cc/NM5T-BXQ2 ..............................................................6

H.R. Rep. No. 89-308 (1965)..................................................................8

*In re Acad. For Jewish Educ.*, Dep't of Educ.,
    1994 WL 1026087 (Mar. 23, 1994) ....................................... 12, 37

Linda E. Coco, *Mortgaging Human Potential*,
    42 Sw. L. Rev. 565 (2013) ..............................................................6

Martha Minow, *Reforming School Reform*,
    68 Fordham L. Rev. 257 (1999)..................................................6

Nat'l Ass'n of Realtors, *2023 Profile of Home Buyers & Sellers* (2023),
    https://perma.cc/S6EL-NC7N.....................................................54

Nick Anderson, *Democrats Join GOP in Voting to Block Tighter
    Regulation of For-Profit Schools*, Wash. Post (Feb. 19, 2011),
    https://perma.cc/A8XY-5Q2P .....................................................14

O*Net OnLine, *See All Occupations*,
    https://perma.cc/6VTL-HB4A .....................................................42

Oxford English Dictionary (online ed.) ................................................30

Random House Dictionary of the English Language
    (2d ed. unabridged, 1987)....................................................... 30, 44

S. Rep. No. 89-758 (1965) ....................................................................8

S. Rep. No. 92-346 (1971) ..................................................................40

Samuel Fallows, *A Complete Dictionary of Synonyms & Antonyms* (1898)..............6

U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook:  Barbers,
    Hairstylists, and Cosmetologists*, https://perma.cc/8QCL-94SV ......................56

Webster's New International Dictionary (2d ed. unabridged, 1954)........................30

## INTRODUCTION

This appeal concerns an extraordinary rule promulgated by the Biden Administration that seeks to revive and intensify an unlawful Obama Administration effort to transform decades-old statutory text into authority to exclude for-profit schools from federal student aid. The Department of Education designed the rule—the so-called "gainful employment" rule—to affect nearly every program at thousands of for-profit schools nationwide. But the Department reserved the biggest blow for cosmetology (or beauty) schools, including those operated by Plaintiffs here: Ogle School Management, LLC (Ogle); Tricoci University of Beauty Culture LLC (Tricoci); and the American Association of Cosmetology Schools (AACS). Indeed, nearly all cosmetology programs that generate sufficient data for the rule's application are slated to fail its atextual and irrational tests and lose their ability to process federal student aid as a result. The rule thus all but disables programs that provide flexible and in-demand career opportunities for students who are overwhelmingly minority and female from participating in student-aid programs that Congress expressly expanded to include vocational training. Simply put, the gainful-employment rule is the poster child of regulatory overreach and cannot stand.

The statute at issue here is the Higher Education Act of 1965 (HEA). Title IV of the HEA authorizes federal student-aid programs, and schools can participate in

those programs only after qualifying as "eligible" under Title IV. Congress has expressly included for-profit schools among the schools that can secure such eligibility so long as they satisfy certain conditions. One of those conditions is that for-profit schools must "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," with "eligible program" similarly defined as "a program of training to prepare students for gainful employment in a recognized profession."

Until 2011, the Department enforced that gainful-employment language consistently with its ordinary meaning: For-profit schools simply had to provide instruction designed to get current enrollees in the program ready for paying work in an acknowledged vocational field, such as cosmetology, as distinct from providing more general instruction in the liberal arts. But during the Obama Administration, the Department purported to discover lurking "ambiguity" in the statute and deployed it against for-profit schools. Thus, in both 2011 and 2014, the Department invoked *Chevron* and issued rules (2011 Rule and 2014 Rule) that sought to strip programs at for-profit schools of Title-IV eligibility based on various dubious tests, including ones that examined the debt-to-earnings ratios of program graduates several years after they left school. But after for-profit schools successfully challenged those rules—which blamed schools for voluntary decisions by graduates to work part time or not at all for personal reasons and had a disproportionate effect

on cosmetology programs that are attractive precisely because they prepare students for a career that lends itself to flexible work schedules and part-time work—the Department relented during the Trump Administration and admitted in another rule issued in 2019 (2019 Rule) that it had "incorrectly described congressional intent" with its gainful-employment regulations and had engaged in "regulatory overreach." Accordingly, the Department swore off the "fundamentally flawed" regulatory effort that began in 2011.

Or so it seemed. During the Biden Administration, the Department reversed course and boldly announced—twice-bitten but not at all shy—that it would adopt the "strongest-ever" gainful-employment rule. In 2023, the Department did exactly that when it promulgated the rule challenged here (the 2023 Rule). The 2023 Rule establishes two tests that supposedly enforce the HEA's gainful-employment language. The first test is familiar: Relying on the same sources that inspired the Department's *Chevron*-dependent 2011 and 2014 Rules—sources that the Department repudiated in the 2019 Rule—the first test seeks to examine whether more than half of program graduates who are three years removed from school devote more than 8% of their annual earnings or more than 20% of their discretionary earnings to pay down their student-loan debt each year. The second test, however, emerged for the first time in the HEA's 60-year history: It examines whether the median program graduate who is three years removed from school

3

(regardless of whether she has voluntarily exited the labor force) is outearning the median high-school graduate in her state aged 25-34 who never enrolled in postsecondary education (but only if the latter is in the labor force).

Failing the Department's atextual tests produces dire consequences. If a program fails either test just once, schools must warn current and prospective students that a loss of Title-IV aid is on the horizon—warnings that the Department believes may prompt transfers and non-enrollments. And if a program fails either test in two out of three years, it is disqualified from Title-IV programs altogether. Failing the 2023 Rule's tests, moreover, is no remote possibility but a virtual certainty for programs providing valuable training to minority women. The Department's own data revealed that, of the hundreds of cosmetology programs nationwide subject to the 2023 Rule, virtually every one of them (all but 13) would fail one or both tests. Those failing programs include those operated by Plaintiffs or their members, which—for decades—have well prepared students nationwide for well-paying and flexible opportunities in salons. Given that most of Plaintiffs' students rely on Title-IV aid, the 2023 Rule will fundamentally disrupt operations.

Although both the 2011 and 2014 Rules did not survive court challenges, and although the Supreme Court overruled *Chevron* in the interim, the district court upheld the 2023 Rule in the decision below and awarded summary judgment to the Department. That decision is untenable. In reality, the 2023 Rule goes far beyond

the Department's statutory authority and is arbitrary and capricious on multiple levels. The Court should reverse the decision below and restore both the plain meaning of the HEA's gainful-employment language and common sense.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331. That court entered its final order and judgment on October 2, 2025, *see* ROA.4160, and Plaintiffs timely appealed on November 23, 2025, *see* ROA.4164; Fed. R. App. P. 4(a)(B). This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the Department's interpretation of "gainful employment" is consistent with the HEA.

2. Whether the 2023 Rule is arbitrary and capricious.

## STATEMENT OF THE CASE

### A. Historical & Statutory Background

Congress has long supported educational initiatives, including vocational training designed to prepare students for gainful employment. In 1917, Congress enacted the Smith-Hughes Act—"the Magna Carta of vocational education," David Carleton, *Landmark Congressional Laws on Education* 63 (2002) (Carleton)—which provided subsidies to states to fund teacher salaries provided that "the controlling purpose of such education shall be to fit" students for "useful

5

employment" in particular fields.  Pub. L. No. 64-347, §§2-3, 10-11, 39 Stat. 929, 930-31, 934 (1917).  "Useful employment" is synonymous with "gainful employment," *see* Gov't.Cross-Mot.for.SJ.at.17, *APSCU v. Duncan*, No. 14-cv-1870 (D.D.C. filed Mar. 6, 2015), Dkt.18 [U.S.*APSCU*.SJ.Br.], and both mean paid work, *see* Samuel Fallows, *A Complete Dictionary of Synonyms & Antonyms* 121, 206, 256 (1898) (describing "useful" as synonymous with "gainful" and "remunerative," and describing "[]remunerated" as synonymous with "[]paid"); *New Prime Inc. v. Oliveira*, 586 U.S. 105, 114 (2019) (explaining that "employment" historically meant "work").

After World War II, the federal government refined its approach and began "provid[ing] financial support directly to students."  Linda E. Coco, *Mortgaging Human Potential*, 42 Sw. L. Rev. 565, 582 (2013).  In the 1940s, the GI Bill offered subsidies directly to veterans to attend their preferred institutions.  *See* Pub. L. No. 78-346, 58 Stat. 284 (1944).  Although some "fly-by-night" for-profit schools "cropped up" "to take advantage of public dollars," Martha Minow, *Reforming School Reform*, 68 Fordham L. Rev. 257, 265 n.18, 266 n.23 (1999), the GI Bill achieved great success, sending millions to college, *see* Dep't of Educ., *Federal Role in Education*, https://perma.cc/NM5T-BXQ2.  Then, in the 1950s, Congress passed other education legislation to bolster national security, including the National Defense Education Act, which provided "national defense fellowships" for students

"not engag[ed] in gainful employment other than part-time employment … in teaching, research, or similar activities." Pub. L. No. 85-864, §§401-05, 72 Stat. 1580, 1590-91 (1958).

By the 1960s, Congress determined that offering aid to even more Americans would best serve the national interest. Thus, Congress enacted two statutes in 1965 to benefit students at different schools. The first—the HEA, *see* Pub. L. No. 89-329, 79 Stat. 1219 (1965)—offered funding to students attending "a public or other nonprofit institution" that admitted only "secondary school[]" graduates. *Id.* §435(a)(1), (4). Eligible institutions under the HEA also had to provide one or more of the following programs: (1) "an educational program for which it awards a bachelor's degree," (2) "not less than a two-year program which is acceptable for full credit toward such a degree," or (3) "not less than a one-year program of training to prepare students for gainful employment in a recognized occupation." *Id.* §435(a). In other words, under the HEA, only public or nonprofit institutions could participate in Title-IV programs, and only if they exclusively admitted high-school graduates, but students attending those schools could enroll either in liberal-arts programs or in vocational programs designed to prepare them for paid employment in particular fields.

Congress enacted the second relevant statute—the National Vocational Student Loan Insurance Act of 1965 (NVSLIA)—to complement the HEA. Pub. L.

No. 89-287, 79 Stat. 1037 (1965).  The NVSLIA offered funding to students attending "a business or trade school, or technical institution or other technical or vocational school," that provided "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations." *Id.* §17(a)(2).  The NVSLIA also stated that eligible institutions could "admit[] as regular students only persons who have completed or left elementary or secondary school."  *Id.* §17(a)(1).  The NVSLIA thus expanded the range of institutions where students could receive federal student aid "as widely as possible" and ensured that the "large numbers of actual and potential students who have left elementary or secondary school" could receive vocational training that would prepare them for paid work.  S. Rep. No. 89-758, at 3, 12 (1965); H.R. Rep. No. 89-308, at 9 (1965).  At the same time, Congress sought to protect the public fisc by "eliminat[ing] from eligibility" the "'fly by night' institutions of the post-World War II era," which Congress achieved by "requir[ing] an institution to have been in existence for 2 years."  S. Rep. No. 89-758, at 12; H.R. Rep. No. 89-308, at 9; *see* NVSLIA §17(a)(3).

This bifurcated scheme did not last long.  In 1968, Congress repealed the NVSLIA and "[m]erge[d]" it with the HEA.  Pub. L. No. 90-575, 82 Stat. 1014, 1023 (1968).  In the updated HEA, Congress renamed as "institution[s] of higher education" the public and nonprofit schools that qualified as eligible institutions

under the original HEA, while dubbing as "vocational school[s]" the institutions eligible under the NVSLIA. *Id.* §116(a). Although the merger allowed for-profit schools that provided vocational education to qualify for Title-IV programs for the first time, the updated HEA otherwise maintained the same eligibility features that existed pre-merger. Thus, for-profit "vocational schools" could qualify as Title-IV eligible if (among other things) they provided programs "designed to fit individuals for useful employment in recognized occupations," "admit[ted] as regular students only persons who have completed or left elementary or secondary school," and "ha[d] been in existence for two years." 20 U.S.C. §1085(c) (1970).

For almost 25 years, Congress left this statutory scheme largely untouched. *See* 20 U.S.C. §1085(b)-(c) (1992). But in the Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (1992), Congress acted again, removing the term "vocational school" from the HEA and replacing it with two other terms: "proprietary institution of higher education" (to cover for-profit schools focused on career and technical education) and "postsecondary vocational institution" (to cover public and nonprofit schools focused on career and technical education). *Id.* §481; *see* 20 U.S.C. §1088(b)-(c) (1994).

Although Congress tweaked the Title-IV-eligibility requirements for these schools, it left much in place. Whereas for-profit "vocational schools" previously had to provide programs "designed to fit individuals for *useful* employment in

9

recognized occupations," the 1992 amendments stated that "proprietary institutions of higher education" and "postsecondary vocational institutions" had to "provide an eligible program of training to prepare students for *gainful* employment in a recognized occupation," with "eligible program" similarly defined as "a program of training to prepare students for *gainful* employment in a recognized profession." *Id.* §1088(b)(1), (c)(1), (e)(1)(A)(i) (1994) (emphases added). As the Department has recognized, there is "not" a "substantive" difference between "useful employment" and "gainful employment." U.S.*APSCU*.SJ.Br.17. Furthermore, whereas "vocational schools" could "admit[] as regular students only persons who have completed or left elementary or secondary school," the 1992 amendments similarly allowed "proprietary institutions of higher education" and "postsecondary vocational schools" to "admit[] as regular students persons who are beyond the age of compulsory school attendance," even if they never graduated from high school. 20 U.S.C. §1088(b)-(c) (1994). And just as "vocational schools" had to "ha[ve] been in existence for at least 2 years," the 1992 amendments said the same thing about "proprietary institution[s] of higher education" and "postsecondary vocational schools," *see id.* §1088(b)(5), (c)(3), ensuring that fly-by-night schools could not proliferate.

Today, "proprietary institutions of higher education" and "postsecondary vocational schools" can secure Title-IV eligibility by meeting these same

requirements and certain others. *See* 20 U.S.C. §§1002(b)(1)-(2), (c)(1)-(2), 1088(b)(1)(A)(i). And recognizing that for-profit schools are capable of providing more than vocational training, Congress in 2008 (via the Higher Education Opportunity Act) allowed schools to establish Title-IV eligibility by "provid[ing] a program leading to a baccalaureate degree in liberal arts." *Id.* §1002(b)(1)(A); *see* Pub. L. No. 110-315, 122 Stat. 3078, 3086 (2008).

## B. Regulatory Background

As this history reveals, for nearly 60 years, Congress has made clear that for-profit schools are eligible to participate in federal-student-aid programs, including Title-IV programs, if they offer training programs to prepare students for gainful/useful employment in recognized occupations or professions. For nearly 50 of those years, it never occurred to the Department that this statutory language did more than differentiate vocational training from liberal-arts programs or that the Department could use it to render schools or programs ineligible to process student aid if their students did not, in fact, obtain employment after graduation, let alone if their alumni did not meet certain earnings benchmarks several years after leaving school. Instead, the Department maintained that the "statutorily intended goal or result" of this language is simply "preparation for gainful employment in such an occupation"—"not that such a goal or result be potentially derived or incidentally

11

available at the conclusion of the program." *In re Acad. For Jewish Educ.*, Dep't of Educ., 1994 WL 1026087, at *2-3 (Mar. 23, 1994); *see* ROA.2001.

***The 2011 Rule:*** In 2011, the Obama Administration radically departed from this settled understanding and declared that the HEA's "gainful employment" language is now "subject to many different views and interpretations." 76 Fed. Reg. 34,386, 34,393 (June 13, 2011). Latching onto this purported ambiguity, the Department issued a rule stating that it would determine whether programs at for-profit schools could qualify as Title-IV-eligible by measuring graduates' ability "to repay their [student] loans." *Id.* at 34,388, 34,393.

The 2011 Rule contained two tests. The first, which examined graduates' debt-to-earnings ratios using only those earnings reported on federal tax filings, assessed whether—in the initial years after graduation—graduates had an "annual loan payment" at or below 12% of total "annual earnings," or at or below 30% of "discretionary income" (defined as earnings above 150% of the federal poverty guideline). *Id.* at 34,400, 34,450. The second measured whether graduates had a "loan repayment rate" of "at least" 35%. *Id.* Failing both tests once or twice in a specified period required schools to issue warnings to students, while failing three times resulted in a loss of Title-IV eligibility. *See id.* at 34,388.

Those numerical thresholds had no grounding in the HEA. The Department plucked the 35% loan-repayment rate from thin air, and it selected the 12% and 30%

debt-to-earnings metrics after reviewing "research conducted by economists Sandy Baum and Saul Schwartz," who issued a 2006 academic paper titled "How Much Debt Is Too Much?  Defining Benchmarks for Manageable Student Debt."  75 Fed. Reg. 43,616, 43,620 (July 26, 2010); *see* ROA.2551-67).  Baum & Schwartz never considered the HEA.  Instead, after consulting sources like "[t]he European literature on overindebtedness," they settled on the self-described "somewhat arbitrary" ceiling of 20% of discretionary income (*i.e.*, "income exceeding 150 percent of the poverty level") as the benchmark.  ROA.2558, 2565-66.  In doing so, Baum & Schwartz explained that the theretofore-most-common benchmark for assessing excessive debt—when non-mortgage-related debt exceeds 8% of annual earnings— has serious "shortcomings" and "no particular merit or justification" in the student-loan context.  ROA.2556-57.

After providing that background, the Department proclaimed that it had chosen the debt thresholds of 30% of discretionary earnings and 12% of annual earnings because they are "50[%]" higher than the 20% and 8% figures discussed by Baum & Schwartz.  75 Fed. Reg. at 43,620.  The Department also observed that it received many comments explaining that debt-to-earnings measures based on reported income are inaccurate in cash- and tip-heavy sectors like cosmetology, but to ameliorate that issue, it said that any program that failed the debt-to-earnings test

could submit "alternative earnings data" and obtain recalculation. 76 Fed. Reg. at 34,421, 34,425, 34,428-29.

The 2011 Rule generated bipartisan opposition. *See, e.g.*, Nick Anderson, *Democrats Join GOP in Voting to Block Tighter Regulation of For-Profit Schools*, Wash. Post (Feb. 19, 2011), https://perma.cc/A8XY-5Q2P. It also generated a legal challenge. *See APSCU v. Duncan* (*APSCU I*), No. 11-cv-1314 (D.D.C. filed July 20, 2011), Dkt.1. The court applied the now-overruled *Chevron* doctrine to sustain the government's novel statutory theory, but it also held that, because the 35% loan-repayment-rate test "was not based upon any facts at all," it failed arbitrary-and-capricious review. *See APSCU I*, 870 F.Supp.2d 133, 146, 154 (D.D.C. 2012). The court ultimately set aside the 2011 entirely. *See id.* at 154.

***The 2014 Rule:*** The Obama Administration promulgated a new rule in 2014. *See* 79 Fed. Reg. 64,890 (Oct. 31, 2014). While the Department abandoned its loan-repayment-rate test, it doubled-down on the *Chevron*-dependent proposition that the HEA's gainful-employment language meant that the Title-IV eligibility of programs could hinge not on the nature of in-school instruction, but on post-graduate debt-to-earnings ratios. Again invoking Baum & Schwartz and "mortgage industry practices," the Department proclaimed that programs would fail the 2014 Rule—requiring schools to issue warnings before their programs lost Title-IV eligibility—if graduates had a median annual loan payment above 30% of discretionary earnings

and 12% of annual earnings, with the earnings figures still coming from federal tax filings. *See id.* at 64,919. But again acknowledging the "underreporting" problem on those tax filings, the Department allowed schools with failing programs to initiate an "alternate earnings appeal" involving different data. *Id.* at 64,955, 65,010.

The 2014 Rule prompted three legal challenges. In two, the courts applied *Chevron* deference and rejected other arguments. *See APSCU v. Duncan* (*APSCU II*), 110 F.Supp.3d 176 (D.D.C. 2015), *aff'd,* 640 F.App'x 5 (D.C. Cir. 2016); *Ass'n of Proprietary Colls. v. Duncan*, 107 F.Supp.3d 332 (S.D.N.Y. 2015). But the Department lost the third lawsuit, which focused on the distinct problems that the 2014 Rule posed for cosmetology schools. That suit, brought by Plaintiff AACS, challenged both the Department's decision to rely on federal earnings data and the stringent alternate-earnings-appeal process. *See AACS v. DeVos*, No. 17-cv-263 (D.D.C. filed Feb. 10, 2017). The district court ultimately agreed that the Department's "wooden use" of federal earnings data "is problematic," as the Department "openly acknowledged that underreporting is an issue" in the cosmetology sector. *AACS v. DeVos*, 258 F.Supp.3d 50, 63, 73 (D.D.C. 2017). The court also determined that the Department's alternate-earnings-appeal process did not mitigate the problem, as the Department had "unjustifiably made appeals difficult to mount." *Id.* at 61, 64. The Department did not appeal that ruling and never fully implemented the 2014 Rule.

***The 2019 Rule:*** During the Trump Administration, the Department announced its intent to rescind the 2014 Rule, *see* 83 Fed. Reg. 40,167 (Aug. 14, 2018), and followed through in 2019, *see* 84 Fed. Reg. 31,392 (July 1, 2019). In the process, the Department "recognize[d]" that it had "incorrectly described congressional intent" when promulgating the 2014 Rule and "engaged in regulatory overreach." *Id.* at 31,402. For decades, the Department observed, "the term 'gainful employment' has been widely understood to … differentiate[] between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities," as Congress "reaffirmed" in the Higher Education Opportunity Act of 2008, which allowed certain for-profit schools to secure Title-IV eligibility by "offer[ing] baccalaureate degrees in liberal arts" instead of career-focused programs. *Id.* at 31,401. The Department emphasized that, "[d]espite numerous reauthorizations of the HEA between 1964 and 2008, Congress never attempted to define 'gainful employment' based on a mathematical formula nor did it attempt to define the term using threshold debt-to-earnings ratios." *Id.* at 31,402. The Department also stressed that "Congress has elected to address concerns about unmanageable student loan debt" in other deliberate ways. *Id.* at 31,401. The Department thus explained that it would return to "enforc[ing] the law … in the same way it enforced it" before 2011—by "disallow[ing] proprietary institutions, other than those exempted by the above-mentioned provision of the

16

[Higher Education Opportunity Act of 2008], to offer general studies, liberal arts, humanities, or other programs not intended to prepare students for a named occupation." *Id.*

Apart from finding the 2014 Rule *ultra vires*, the Department found its debt-to-earnings tests "fundamentally flawed." *Id.* at 31,438. The Department admitted that the 8% ratio assessing debt-to-annual-earnings "is not appropriate" in this context, as it is "a mortgage standard and one that 'has no particular merit or justification' for use in establishing student borrowing limits"—as Baum & Schwartz themselves observed. *Id.* at 31,407; *see id.* at 31,426. The Department also explained that it had "failed to provide a sufficient, objective, and reliable basis" for the 20% ratio assessing debt-to-discretionary-earnings. *Id.* at 31,407.

The Department's self-critique continued. It observed that it "does not believe that it should sanction institutions" because of incorrect federal earnings data or "for aspects of student debt and earning outcomes that are outside of the institution's control." *Id.* at 31,409. The Department noted that, in "heavily tip-influenced professions, such as cosmetology," not all income is reported to the government—which is "not the fault of institutions"—and that underreporting "renders the earnings portion of the D/E calculation subject to significant errors." *Id.* at 31,409-10. Moreover, the Department recognized that individuals leave the workforce or work part-time for valid reasons—*e.g.*, "to care for children"—and that

17

"[p]enalizing programs" for those choices is "absurd." *Id.* at 31,410, 31,413. The Department also stated that, "because the GE regulations do not calculate D/E rates until years after" graduation, they compelled schools "to predict macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future in order to establish a price that will guarantee passing D/E rates"—"a nearly impossible task." *Id.* at 31,417.

The Department next lamented that "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups," thus affecting earnings-based measures. *Id.* at 31,414. Relatedly, the Department noted that, because many affected "programs serve high proportions of women and minorities," a regime that "would eliminate these programs could reduce postsecondary opportunities" and compound socioeconomic problems. *Id.* Specifically, the Department acknowledged that cosmetology programs suffered under its prior regime: "[C]osmetology … programs were disproportionately represented among the programs that failed the D/E rates measure," but these are "'bright outlook' occupations," so "GE-related program closures could reduce availability of … programs needed to fill high-demand occupations." *Id.* at 31,400 (footnote omitted). In short, the Department "determined that the 2014 Rule is fundamentally flawed and … should not serve as the basis for high stakes sanctions that negatively impact institutions and students." *Id.* at 31,426.

## C. The Challenged 2023 Rule

In May 2023, the Biden Administration reviewed this history and reached the stunning conclusion that the time had come to promulgate "the strongest-ever Gainful Employment rule." Cory Smith, *Federal education officials take aim on student debt from for-profit colleges*, ABC-7 (May 18, 2023) (quoting Department press release), https://tinyurl.com/yzue5enj; *see* 88 Fed. Reg. 32,300 (May 19, 2023). The Department did just that in October 2023, when it promulgated the 2023 Rule that precipitated this lawsuit. *See* 88 Fed. Reg. 70,004 (Oct. 10, 2023). The 2023 Rule's centerpiece is "an accountability and eligibility framework for gainful employment programs" that "reinstates" rejected features of the 2014 Rule while introducing an additional element never before seen in the HEA's history. *Id.* at 70,005.

The 2023 Rule thus has two distinct tests. The first represents the Department's third effort to determine whether the HEA's gainful-employment language is satisfied utilizing debt-to-earnings ratios. "[B]ased on research conducted by economists Sandy Baum and Saul Schwartz" and "mortgage-underwriting standards," the first test assesses whether the share of annual earnings that the median graduate in a two- or four-year cohort period needs to devote to paying down her debt (amortized over a 10-year period for the certificate programs offered by cosmetology schools) is less than or equal to 8%, or less than or equal to

20% of discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline). *See id.* at 70,020, 70,124. The second test—the "earnings premium"—is entirely novel. It purports to examine whether at least half of program graduates (*including* those who have voluntarily opted out of the labor force in the years after graduation for personal reasons) have higher earnings than median in-state high-school graduates aged 25-34 who never enrolled in postsecondary education (*not including* those high-school graduates who have voluntarily opted out of the labor force). *See id.* at 70,124-25. *But cf.* p.34, *infra* (noting that 20 U.S.C. §1002(b)-(c) expressly permits for-profit schools to enroll students who did *not* graduate from high school).

In most circumstances, the Department will conduct these tests three years after the students have graduated, and "[t]he first official rates … will … be based on students who completed a program in award years 2018 and 2019, measuring their earnings outcomes in 2021 and 2022." *Id.* at 70,037, 70,099. While the Department chose to base initial eligibility determinations on years profoundly influenced by "the COVID-19 pandemic," the 2023 Rule refuses to account for the pandemic or other exogenous factors that may depress earnings, like economic "recessions" or decisions by graduates to "choos[e] not to work full-time" or opt out of the labor force—even though the Department acknowledged that the pandemic likely impacted earnings in "the beauty industry," *id.* at 70,092, and that graduates

"often … choose to leave the labor force for reasons that do not reflect their ability to find a job," *id.* at 70,035, 70,045, 70,099.

As with the 2011 and 2014 Rules, failing the 2023 Rule's tests is no trivial matter. If a program fails either the debt-to-earnings or earnings-premium tests once, the school must warn all students enrolled or interested in a program that it may lose Title-IV eligibility the next year. *See id.* at 70,052, 70,084, 70,193. Such warnings, the Department anticipates, may prompt students "to transfer to another program or choose not to enroll in such a program." *Id.* at 70,078. Moreover, the Department has stated that, if schools have failing programs under the first round of gainful-employment metrics, they may have to post "letters of credit" within 45 days of email notification from the Department. *See* Dep't of Educ., *Electronic Announcement ID: General-24-74* (June 20, 2024), https://rb.gy/nwwgs3. Finally, if a program fails the same metric in two out of three consecutive years, it is disqualified from Title-IV programs entirely. *See* 88 Fed. Reg. at 70,052, 70,084.

Notably, the Department has acknowledged that it is incapable of applying its understanding of the gainful-employment language to most schools covered by it. For instance, because "[t]he Department must have student outcomes data to measure program performance, which can only come after a period of time," "new programs" can satisfy the gainful-employment language and qualify as Title-IV-eligible even though the Department cannot apply the tests that purportedly capture

Congress' intent vis-à-vis that language. *Id.* at 70,018. The Department also stated that, because it lacked "confiden[ce]" in the data for U.S. Territories and the Freely Associated States (the Marshall Islands, Micronesia, and Palau), it had no choice but to "exempt" every school in those locations from the 2023 Rule too. *Id.* at 70,027-28. And "to protect the privacy of individuals who complete smaller programs," the Department concluded that it could not legitimately apply its tests to programs with fewer than 30 graduates in a four-year cohort period. *Id.* at 70,046. That 30-graduate "n-size" threshold, the Department admitted, meant that 74% of all gainful-employment programs are not covered by its rule (although the programs that are covered enroll the majority of students). *See id.* at 70,127-28 & tbl.4.2, 70,046.

The Department further recognized that the 2023 Rule has imperfections for programs that remain subject to it—especially for cosmetology programs. For example, the Department announced that it would again use federal taxpayer data for the 2023 Rule, expressing a "preference for … IRS data." *Id.* at 70,045. The Department acknowledged, however, that studies have shown that federal earnings data are off-the-mark by at least 8-10% for cosmetologists due to underreported tip income, with some placing the overall underreported-income figure as high as 60%. *See id.* at 70,042 & n.139. Nonetheless, the Department declared that it would rely exclusively on federal earnings data "without an opportunity to appeal" or

22

"accommodation for the possibility of income underreporting." *Id.* at 70,042, 70,090.

The 2023 Rule is projected to devastate the cosmetology sector. Of the 1,270 cosmetology programs currently eligible for Title-IV funding, *only 13 would satisfy the 2023 Rule. See* Dep't of Educ., *GE Data3\*—Dataset*, Regulations.gov (June 2, 2023), https://perma.cc/NH25-Z3BX, *cited at* ROA.218 n.2. The majority of programs—638 programs enrolling 80% of students attending cosmetology programs, *compare* 88 Fed. Reg. at 70,140 (Table 4.18), *with id.* at 70,139 (Table 4.16)—would fail. Of those 638 programs, 506 would fail based on the newly invented earnings-premium test, while the remaining 132 would fail both that test and the debt-to-earnings test. The remaining programs would duck the rule entirely because they are too new, too small, or in geographically remote areas.

The programs operated by Plaintiffs or their members are among those projected to fail. *See* ROA.23, 4649-50, 4668-69. Thus, as long as the Department is free to enforce its debt-to-earnings and earnings-premium tests, Plaintiffs' programs are almost certain to lose access to the Title-IV aid on which their students rely, even though those programs have existed for decades and even though the overwhelming majority of graduates—who are almost exclusively female and/or minorities—are sufficiently well prepared to pass state licensure exams and to secure placement in their fields of study. *See, e.g.*, ROA.4648, 4650, 4667, 4669.

### D. Procedural History

Given these devastating consequences, Plaintiffs challenged the 2023 Rule as *ultra vires* and arbitrary and capricious under the Administrative Procedure Act (APA).[1] As relevant here, Plaintiffs moved for summary judgment and received amicus support from numerous states—Kansas, Missouri, Texas, Alabama, Indiana, Montana, South Carolina, and Utah—which collectively derided the 2023 Rule as the latest effort by the Biden Administration to "overstep[] Congress." ROA.3925.

The district court denied Plaintiffs' motions for summary judgment and granted the government's cross-motion without hearing argument, even though all parties requested it. The court first concluded that the Department did not exceed its statutory authority in promulgating the 2023 Rule. According to the court, because the HEA's "gainful employment" language means "profitable employment," the Department may invoke its authority to issue "necessary" and "reasonable" regulations to "call employment unprofitable when a student remains in high loan debt." ROA.4138-42. The court also held that the Department did not act arbitrarily or capriciously in promulgating the 2023 Rule, *see* ROA.4142-52, even though it

---

[1] Ogle and Tricoci filed one suit; AACS filed another; and the district court consolidated both. Ogle and Tricoci also sought a preliminary injunction, which the district court denied. *See* ROA.1982-83.

embraces concepts that the Department itself previously deemed arbitrary and capricious.

## SUMMARY OF ARGUMENT

The third time is not the charm in the Department's regulatory quest to strip Title-IV eligibility from for-profit schools based on the HEA's gainful-employment language. Just like the 2011 and 2014 Rules before it, the 2023 Rule is contrary to the clear statutory text and arbitrary and capricious to boot. This Court should reverse and vacate the 2023 Rule.

The Department's understanding of the HEA's gainful-employment language is divorced from the statute. Since the Department promulgated the 2023 Rule, the Supreme Court has given federal courts clear direction in cases like this one: Use all tools of statutory construction to determine the best interpretation of a statute and reject contrary interpretations—even reasonable or permissible ones—proffered by administrative agencies based on perceived ambiguities. Those tools confirm that the Department's interpretation of the HEA's gainful-employment language is not remotely close to the best one and is just plain wrong. Ordinary meaning confirms that the text of the operative statutory language—which requires for-profit schools seeking Title-IV eligibility to "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," 20 U.S.C. §1002(b)(1)(A)(i); *id.* §1088(b)(1)(A)(i)—simply requires those schools to provide

instruction that provides current enrollees the skills needed for paying work in an acknowledged vocation field, without regard to whether graduates ultimately seek such work or economic conditions permit them to find it. The language is designed to authorize funding for vocational training in contradistinction from four-year liberal arts programs. The gainful-employment language thus focuses on the training provided to current enrollees (which, not incidentally, is subject to the school's control) and has nothing to do with debt-to-earnings ratios or income relative to an age-restricted pool of in-state high-school graduates (which, not incidentally, turns on graduates' life choices and micro- and macro-economic conditions wholly outside the school's control). Confirming the point, the HEA contains numerous other provisions proving that Congress knew how to address matters of debt and earnings when it wanted. The HEA also contains other provisions with "gainful employment" language, and none indicates that the phrase relates to debt and earnings or means anything other than paying work. And decades of history and established practice reinforce that common-sense understanding. The district court arrived at the contrary conclusion only because it refused to open its interpretive toolkit or engage with Plaintiffs' arguments.

The Department has also engaged in arbitrary and capricious action in at least four ways. With respect to cosmetology programs, the 2023 Rule utilizes earnings data that the Department and its handpicked sources consider inaccurate. The

Department is also penalizing schools for factors beyond their control—such as a graduate's voluntary decision to exit the labor force (or work part-time) to care for children. In addition, the Department is embracing a debt-to-earnings test that hinges on percentage thresholds that the Department itself has previously rejected as inappropriate. And the Department is threatening to shutter nearly all Title-IV-eligible cosmetology programs for which it has sufficient data to apply its tests—all in an effort to encourage enrollment at other programs, even though the Department does not have any data for those programs and does not know whether they are worse. Nothing in the district court's decision suggests that the Department's action is anything but illogical. This Court should bring the Department's ongoing effort to divine varying atextual requirements from the gainful-employment language to an end.

## STANDARD OF REVIEW

This Court reviews a district court's resolution of summary-judgment motions *de novo*. *See Rest. L. Ctr. v. DOL*, 120 F.4th 163, 170 (5th Cir. 2024).

# ARGUMENT

**I. The Department's Interpretation Of The HEA's "Gainful Employment" Language Is Inconsistent With The Statute.**

**A. The "Gainful Employment" Language Is Not A Font For Various Atextual Requirements Having Little To Do With Whether A Vocational Training Program Prepares Students For Gainful Employment.**

As the Supreme Court held in *Loper Bright Enterprises v. Raimondo*—after the promulgation of the 2023 Rule—"[i]n the business of statutory interpretation," the judicial inquiry now involves just one step: find the "best reading" of the statute and apply it. 603 U.S. 369, 400 (2024). Accordingly, if an interpretation "is not the best, it is not permissible." *Id.* To determine the best reading, courts must apply "all relevant interpretive tools." *Id.* Here, those interpretive tools—"[t]ext, context, and history," *Waetzig v. Halliburton Energy Servs., Inc.*, 604 U.S. 305, 312 (2025)— confirm that the Department's interpretation of the HEA is not the best one. The best reading of that statute's "gainful employment" language has nothing to do with debt ratios or income relative to a subset of high-school graduates, and *Loper Bright* forecloses any claim of an implied delegation to import those concepts into the term. The upshot is that the Court "shall hold unlawful and set aside" the Department's regulation. 5 U.S.C. §706(2).

1. "The appropriate starting point when interpreting any statute is its plain meaning." *Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024). The

relevant statutory language here is found in Title IV of the HEA, which states that "institutions of higher education" must "qualify[]"to "participat[e] in programs under" Title IV. 20 U.S.C. §1099c(a). In §1002, the HEA explains that, "for purposes of student assistance programs" in Title IV, the term "institution of higher education" includes a "proprietary institution of higher education," which is in turn defined in pertinent part as one that "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." *Id.* §1002(a), (b)(1)(A)(i). Another HEA provision—§1088—then defines "eligible program" using materially identical language: "a program of training to prepare students for gainful employment in a recognized profession." *Id.* §1088(b)(1)(A)(i).

The Department recognizes that "the HEA does not more specifically define" what it means to provide a program of training to prepare students for gainful employment in a recognized occupation or profession. 88 Fed. Reg. at 70,008. As a result, "the ordinary meaning of the words control." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023). And to determine ordinary meaning, it is "common" for courts and litigants to use "[l]egal or other well-accepted dictionaries." *Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012).

Dictionaries leave little doubt what the relevant language here means. A "program" is "a planned series of activities or events."[2] "Training" is "[s]ustained instruction and practice (given or received) in an art, profession, occupation, or procedure, with a view to proficiency in it."[3] To "prepare" means to "get ready."[4] A "student" is "a person formally engaged in learning, esp. one enrolled in a school or college."[5] "Gainful employment" means "work that a person can pursue and perform for money."[6] "Recognized" means "[a]cknowledged; accepted; known; identified."[7] And "occupation" and "profession" both mean a "vocation."[8] The

---

[2] Oxford English Dictionary (online ed.) (OED); *see* The Random House Dictionary of the English Language 1546 (2d ed. unabridged, 1987) (Random House); Webster's New International Dictionary 1977 (2d ed. unabridged, 1954) (Webster's New International).

[3] OED; *see* Webster's New International 2687; The American Heritage Dictionary of the English Language 1361 (1969) (American Heritage).

[4] Random House 1527; *see* American Heritage 1034.

[5] Random House 1888; *see* American Heritage 1279.

[6] *Gainful Employment* in *Employment*, Black's Law Dictionary (12th ed. 2024); *see* OED (defining "gainful" as "leading to pecuniary gain; lucrative, remunerative"; defining "pecuniary" as "[c]onsisting of money"; defining "lucrative" as "profitable"; defining "remunerative" as "bring[ing] financial remuneration; profitable"; defining "remuneration" as "money paid for work or a service; payment, pay"); *Collins Dictionary*, Gainful Employment, https://rb.gy/cpj3lm (defining "gainful employment" as "an occupation that pays an income"); *Cambridge Dictionary*, Gainful, https://rb.gy/c5dw2b (defining "gainful" as "providing money or something else that is useful").

[7] OED; *see* Webster's New International 2079.

[8] Webster's New International 1684; *see* Random House 1339; OED.

ordinary meaning of the relevant statutory language thus is clear: To qualify as Title-IV-eligible, for-profit schools must provide instruction designed to get those currently enrolled in the program ready for paying work in an acknowledged vocational field, rather than general instruction in the liberal arts. The focus of all those terms is on the program and what it prepares students for; none makes the school the guarantor of job openings, future earnings, or macroeconomic conditions.

That ordinary meaning deals a fatal blow to the Department's repeated attempts to make "gainful employment" mean something markedly different: that it empowers the Department not just to evaluate whether the program includes a course of training designed to prepare students for gainful employment, but to evaluate post-graduate results and sanction programs at for-profit schools—including by prohibiting them from participating in Title IV altogether—if (1) the median program graduate devotes more than 8% of her annual earnings or more than 20% of her discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to pay down her student-loan debt or (2) the median program graduate (regardless of whether she has voluntarily exited the labor force) earns less than the median in-state high-school graduate aged 25-34 who never enrolled in postsecondary education (but only if that high-school graduate is in the labor force). Because the "best" interpretation of the gainful-employment language has nothing to do with debt ratios or median income, *Loper Bright*, 603 U.S. at 400—which

presumably explains why the Department never embraced it until recently—the Department's efforts to import foreign concepts into the statutory text must fail. Indeed, most of what the 2023 Rule and its predecessors address is covered more directly (and less onerously) by different statutory provisions, *see* pp.34-35, *infra*, and has nothing to do with the bedrock requirement that the program provide vocational training rather than a liberal-arts degree.

2.     "Of course, statutes cannot be viewed in isolation, and statutory interpretation requires considering the context and structure of the overall statutory scheme." *Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024). The broader statutory context makes crystal clear that Congress did not envision the HEA's gainful-employment language as a font of authority for the Department to tie Title-IV eligibility to anything other than the nature of the instruction provided.

To start, it bears emphasizing that Congress has long confirmed that for-profit schools offering gainful-employment programs—wherever they are located—can secure Title-IV eligibility even if they have existed for only two years. *See* 20 U.S.C. §1002(b)(1)(E), (c)(1)(C).     As the Department has conceded, however, the "performance results" envisioned by its interpretation of "gainful employment" are "not … available" for those kinds of newer programs, with the 2023 Rule measuring financial outcomes several years *after* that two-year period. 88 Fed. Reg. at 70,018. Nor are those results available for programs offered in certain locations. *See id.* at

70,027-28. The Department's interpretation thus requires the Court to ascribe different meanings to the very same language in the very same provision depending on the factual context—*viz.*, the length of time that a gainful-employment program has existed and the geographic area where the program is offered. The Supreme Court has "forcefully rejected" such "interpretive contortion," which "would render every statute a chameleon." *United States v. Santos*, 553 U.S. 507, 522 (2008); *see United States v. Lopez-Valenzuela*, 511 F.3d 487, 491 (5th Cir. 2007). That is powerful evidence that the Department's interpretation is not the best.

Further confirming that Department reads far too much into far too little, the broader context of the HEA demonstrates that, when Congress wanted to address post-graduate debt and/or earnings, as opposed to whether a program prepares students for some form of gainful employment, it knew precisely how to do so. For example, Congress has declared elsewhere in the HEA that schools offering programs that award undergraduate degrees, graduate or professional degrees, or graduate certificates—*i.e.*, programs that are not captured by the 2023 Rule—may not use Title-IV funds if the median earnings of graduates four years after leaving school do not exceed the median earnings of high-school graduates aged 25-34 who did not attend comparable programs. *See* 20 U.S.C. §1087d(c). If that test sounds familiar, it should, as it is nearly identical to the earnings-premium test set forth in the 2023 Rule. But §1087d conspicuously never even mentions the words "gainful

employment," indicating that the gainful-employment language in §§1002 and 1088 does not cover the same territory. As the Supreme Court has explained, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). There is no reason to deviate from that presumption here. Indeed, it is especially odd to view "gainful employment" as authority for the Department to demand that the median earnings of program graduates exceed the median earnings of in-state high-school graduates when the HEA expressly permits for-profit schools to enroll students who did *not* graduate from high school at all. *See* 20 U.S.C. §1002(b)(2)(A), (c)(2)(A).

Other contextual clues doom the Department's efforts to transform "gainful employment" into a debt-to-earnings test. For instance, Congress has enacted "cohort default rate" provisions that provide that institutions are "ineligib[le]" under Title IV if a certain percentage of their graduates have excessively "high default rates" on their student debt—*i.e.*, if they do not have sufficient earnings to cover their loan payments. 20 U.S.C. §1085(a)(2)(A), (b)(iv), (m)(1). Congress has also provided that a borrower can qualify for debt relief when "the borrower's debt burden equals or exceeds 20 percent of such borrower's gross income." *Id.* §1087dd(e)(1)(A). Furthermore, Congress has provided that a borrower can qualify

for debt relief if she has an "economic hardship," *id.* §1098e(b)(7)(B)(5), which is a term that requires the Department to consider "the borrower's income and debt-to-income ratio," *id.* §1085(o)(2). And Congress has instructed the Department to conduct regular surveys of financial-aid recipients that "describe the debt burden of such loan recipients," "their capacity to repay their education debts," and the "impact of such debt burden on the recipients' … post-graduation plans." *Id.* §1015a(k)(D).

As all of this demonstrates, Congress has repeatedly "shown elsewhere in the same statute" that it "knows" how to use language addressing the subjects that the Department seeks to address through the gainful-employment language. *Jama v. ICE*, 543 U.S. 335, 341 (2005). But Congress "did not do so" in the provision at issue here, "and the contrast is telling." *United States v. Koutsostamatis*, 956 F.3d 301, 309 (5th Cir. 2020). These other statutes thus confirm that, "[i]f Congress had wanted the provision" here "to have th[e] effect" that the Department ascribes to it—that schools must not only provide training for a useful occupation, but guarantee that alumni meet specific debt and earnings benchmarks—it would have "said so in words far simpler." *Biden v. Texas*, 597 U.S. 785, 798 (2022). The fact that Congress chose not to do so buttresses the conclusion that the gainful-employment language just differentiates vocational training from liberal-arts training—a distinction that (as the Department has recognized) Congress explicitly drew when enacting the Higher Education Opportunity Act of 2008, which allowed for-profit schools to

achieve Title-IV-eligibility not only by offering gainful-employment programs but also by offering liberal-arts training. 84 Fed. Reg. at 31,401.

The broader context of the HEA undermines the Department's interpretation of the gainful-employment language in still other ways. After all, Congress has used "gainful employment" language in numerous *other* provisions in the HEA, and none suggests that Congress had complicated debt and earnings metrics rather than something far more basic and binary in mind. In fact, those provisions are coherent only if "gainful employment" means simply a paying job—and not even an especially *high*-paying job. One HEA provision, for example, explains that schools are authorized to allocate grant money to certain students provided that they are not "engaged in gainful employment, other than part-time employment related to teaching, research, or a similar activity"—revealing that even low-paying, part-time student employment amounts to gainful employment. 20 U.S.C. §1036(e)(1)(B)(ii). Nor is that provision an anomaly, as others just like it exist elsewhere in the HEA.[9] *See, e.g., id.* §1134c(a), 1135c(d)(2), 1161g(d)(5)(B). The broader statutory context thus is strike two against the Department.

3.      History is another valuable tool of statutory interpretation, and it confirms what text and context already suggest here. As *Loper Bright* emphasized,

---

[9] This understanding is reflected in the original 1965 version of the HEA too. *See, e.g.*, HEA §527, 79 Stat. at 1260.

36

"the longstanding practice of the government … can inform a court's determination of what the law is." 603 U.S. at 386. Hence, "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.* at 394. At the same time, *Loper Bright* displayed skepticism toward agency interpretations that flip-flop over time and/or emerged years after the enactment of the statutory text. *See id.* at 398-99. The Department's proffered interpretation of the HEA here exemplifies the kind of inconsistent and novel agency position that *Loper Bright* warned against.

For nearly half-a-century after the HEA's enactment, the Department *never* suggested that the statute's gainful/useful employment language meant that it could "tie program eligibility to whether GE programs provide education and training to their title IV, HEA students that lead to earnings beyond those of high school graduates and sufficient to allow students to repay their student loans." 88 Fed. Reg. at 70,005. Instead, the Department understood that the statutory language simply called for an assessment into whether the "preparation" provided to "students" is "for a specific area of employment," *id.* at 70,018 (discussing *In re Acad. For Jewish Educ.*, 1994 WL 1026087), as opposed to "general studies, liberal arts, humanities, or other programs not intended to prepare students for a named occupation," 84 Fed. Reg. at 31,401. While the Department evidently believes that this half-century

"initial[]" period of regulatory restraint poses no obstacle to its more recent campaign to focus on post-graduate "outcome-based measures," 88 Fed. Reg. at 70,014, 70,018-19, that position is impossible to square not only with *Loper Bright*, but with a host of other Supreme Court cases too. As the Supreme Court admonished even before the Department promulgated the 2023 Rule, the fact that an agency "never before adopted" a particular interpretation of a statute in the previous "half century" is a "telling indication" that a regulation suddenly embracing that interpretation is "beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam); *see Biden v. Nebraska*, 600 U.S. 477, 501 (2023); *West Virginia v. EPA*, 597 U.S. 697, 725 (2022).

Equally telling, the Department previously adopted Plaintiffs' understanding of "gainful employment" not only with respect to the specific statutory language at issue here, but in other contexts too. For example, the HEA defines "eligible program" for certain purposes as a program that "has a verified placement rate of at least 70 percent, as determined in accordance with the regulations of the Secretary." 20 U.S.C. §1088(b)(2)(A)(ii). To implement that statutory directive, the Department in 1994 promulgated regulations (which remain in effect today) requiring schools to "determine the number of students who, within 180 days of the day they received their degree, certificate, or other recognized educational credential, obtained *gainful employment in the recognized occupation* for which they were trained or in a related

38

comparable recognized occupation." 34 C.F.R. §668.8(g)(1)(ii) (emphasis added). And to prove that graduates are gainfully employed, the Department requires schools to simply submit documents like "[s]igned copies of State or Federal income tax forms" or "[w]ritten evidence of payments of Social Security taxes"—*i.e.*, evidence that graduates have paying jobs, *id.* §668.8(g)(2)—without any need to inquire into debt loads or the median income of high-school graduates in the area.

There are other telling historical clues here too. As detailed above, long before the HEA's enactment, Congress repeatedly deployed gainful/useful employment language in other statutes, including in the Smith-Hughes Act—the "Magna Carta of vocational education." Carleton 63. Each time, Congress did so in a way that meant merely a paying job—not a job that required a comparison of pay in relation to other factors like debt loads or third-party earnings. *See, e.g.*, 39 Stat. at 930-31, 934; 72 Stat. at 1590-91; pp.5-11, *supra*. Indeed, in the 1970s, Congress explicitly recognized that "gainful employment" means nothing more than paid work when amending a statute (the Vocational Education Act of 1963) that superseded the Smith-Hughes Act. In that amendment, Congress added specific language to bring certain unpaid occupations—*viz.*, "volunteer firemen"—within the ambit of "gainful employment." Pub. L. No. 92-318, §202(b), 86 Stat. 235 (1972). Congress did so not because volunteer fireman did not earn *enough* as compared to some expense or benchmark; it did so because their employment paid them nothing at all and hence

did not fit the ordinary meaning of "gainful." *See* S. Rep. No. 92-346, at 75 (1971) ("Since these firemen serve on a volunteer basis, without compensation, they are not gainfully employed as firemen and therefore their training cannot be considered fundable vocational education. Section 203(b) amends the definition of vocational education to include training for volunteer firemen explicitly.").

Text, context, and history thus all point in the same direction: The Department's efforts to transform the plain meaning of "gainful employment" are *ultra vires*.

## B. The District Court's Contrary View Is Plainly Wrong.

The district court reached the contrary conclusion only because it did the very opposite of "deploying its full interpretive toolkit." *Loper Bright*, 603 U.S. at 409. That is no exaggeration. The sum total of the court's analysis is that "gainful employment" means "profitable employment," and the Department is free to "call employment unprofitable when a student remains in high loan debt" because the Department has authority to promulgate "necessary" and "reasonable" regulations. ROA.4138-42. The court reached that conclusion even as it acknowledged that, "[f]or nearly 60 years," the Department never embraced its current interpretation of the gainful-employment language and instead understood that the language "simply differentiated vocational training from more general, liberal-arts programs." ROA.4132. That reasoning is insufficient to justify what the court below described

40

as the impending "closure" of a "significant percentage" of cosmetology programs nationwide. ROA.4134.

At the outset, the district court's analysis of the gainful-employment language is so cursory that it does not even attempt to explain how the earnings-premium test maps onto it. The earnings-premium test, of course, does not assess "loan debt" at all, ROA.4142, but instead compares the earnings of program graduates several years removed from school to the earnings of an age-restricted pool of in-state high-school graduates. The court's refusal to engage with the earnings-premium test is no trifling concern: That metric *alone* is anticipated to fail the vast majority of cosmetology programs for which the Department has sufficient data to apply the 2023 Rule. *See* p.23, *supra*. Ultimately, however, the court's failure to conceive of a justification for the earnings-premium test is unsurprising, as that test is unmoored from the statute.

The district court's reasoning also cannot justify the debt-to-earnings test. No one is disputing that gainful is synonymous with profitable. In fact, Plaintiffs themselves are responsible for alerting the court below to the overlapping meaning. *See* ROA.4229. But the court lost sight of the fact that "gainful" modifies one very specific word in the statute: "employment." *Cf. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 19 (2018) ("Adjectives modify nouns[.]"). The statute thus is not asking whether programs are producing graduates who lead profitable

lives or whether the financial outcomes of graduates are profitable after accounting for outstanding student loans or other debt. *Contra* ROA.5138. Instead, the statute is clear that the relevant question is whether schools are providing the type of training that can lead to gainful or profitable *work*. *See Gainful Employment* in *Employment*, Black's Law Dictionary (12th ed. 2024) (defining "gainful employment" as "[w]*ork* that a person can pursue and perform for money" (emphasis added)); *New Prime*, 586 U.S. at 114 (explaining that "employment" means "work"). As a matter of ordinary English, when a person is able to get paid for her work—and the work is not merely voluntary—the work is unquestionably gainful or profitable from the worker's perspective.[10] All that explains why lexicographers define the phrase "gainful employment" as "work that a person can pursue and perform for money"—and trace that definition back centuries. *Gainful Employment* in *Employment*, Black's Law Dictionary (12th ed. 2024).

Furthermore, although the district court did not address other operative language in the statute—*i.e.*, "provide a program of training to prepare students"—

---

[10] The Department has never disputed that paid work is available in the cosmetology sector or that working as a cosmetologist is a recognized occupation. *See, e.g.*, 34 C.F.R. §600.2 (defining "Recognized occupation" to include "[a]n occupation … Identified by … an Occupational Information Network O*Net-SOC code"); O*Net OnLine, *See All Occupation*s, https://perma.cc/6VTL-HB4A (listing "Hairdressers, Hairstylists, and Cosmetologists" under O*Net-SOC Code 39-5012.00 and providing wage information).

it is equally illuminating.  Indeed, that language demonstrates that the statutory focus

is on the nature of the instruction that schools provide to current enrollees in the

classroom, *see* pp.30-31, *supra*, not on the financial well-being of graduates who are

not even enrolled in school anymore.  That approach makes good sense.  If Congress

truly intended to "tie program eligibility" to the debt and earnings figures of program

alumni who are years removed from school, 88 Fed. Reg. at 70,005, schools would

have to accomplish the "nearly impossible task" of "predict[ing] macro-economic

conditions, future earnings, and various other factors that influence employment and

earnings well in to the future" in order to obtain Title-IV eligibility, 84 Fed. Reg. at

31,417.  If Congress wanted to achieve that goal, "one would reasonably expect

Congress to say so" more explicitly.  *Chamber of Com. v. DOL*, 885 F.3d 360, 376

(5th Cir. 2018).

Instead of grappling with that reality, the district court emphasized that the

HEA "confers … authority" on the Department to prescribe "reasonable" and

"necessary" regulations.  ROA.4141 (citing 20 U.S.C. §§1094(c)(1)(B),

1099c(d)(2)).  That authority might matter if the gainful-employment language had

multiple different possible definitions, leaving the Department with "flexibility" to

select the most reasonable one.  *Loper Bright*, 603 U.S. at 395.  But there is no

"'discretion' in the premises" here, *id.* at 394, as gainful employment is a binary

concept that simply distinguishes paid work from unpaid work.[11] *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) ("[T]he grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carry[ing] out.'" (alteration in original)). Law clerks for federal judges can confidently say that they are gainfully employed not because they know how their earnings relate to payments for debt incurred outside of their employment or because they have studied state statistical records to confirm that their pay exceeds the median pay of in-state high-school graduates between the ages of 25 and 34. Rather, it is because they receive payment for their work—full stop. Because the 2023 Rule (like every other gainful-employment rule) departs from that ordinary meaning, it is *ultra vires*.

## II. The Department's Action Is Arbitrary And Capricious.

Like other gainful-employment rules, the 2023 Rule is not merely *ultra vires*, but arbitrary and capricious too. The APA requires agency action to "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The 2023 Rule fails under that "searching and careful" standard at least four

---

[11] The term "employment" can simply mean "an activity or the like that occupies a person's time," even if it is unpaid—*e.g.*, "[s]he found knitting a comforting employment for her idle hours." Random House 638. The modifier "gainful" thus clarifies that the relevant type of "employment" here is paid work. *See* 88 Fed. Reg. at 70,067 (recognizing that it is possible to "obtain employment that is unpaid").

times over. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021).

**A. The Department Is Illogically Relying on Concededly Inaccurate Earnings Data.**

One recurring problem with the Department's gainful-employment campaign is its illogical decision to use concededly inaccurate earnings data. As noted, the 2023 Rule sanctions for-profit schools of Title-IV eligibility if, in two out of three consecutive years, (1) the median program graduate devotes more than 8% of annual earnings or more than 20% of discretionary earnings to pay down student-loan debt, or (2) the median program graduate earns less than the median high-school graduate in the state aged 25-34 who never enrolled in postsecondary education. 88 Fed. Reg. at 70,008. The 2023 Rule also requires programs to provide warnings to current and prospective students if they fail either metric once. *See id.* The Department thus finds itself in a position similar to the one that it occupied vis-à-vis the 2011 and 2014 Rules: subjecting programs to draconian sanctions based on tests that use post-graduate earnings data as a critical input.

Under those prior regimes, the Department relied on datasets that included only those earnings reported by taxpayers to the federal government. But the Department understood that many professionals who work in cash- and tip-heavy fields—especially "cosmetology"—do not actually report all earnings to the federal government. 76 Fed. Reg. at 34,424-25. Indeed, in recent years, the Department

has "openly acknowledged that underreporting is an issue, even identifying cosmetology schools by name," and that studies estimated that "both tip income and self-employment income are, on average, underreported by around 60%." *AACS*, 258 F.Supp.3d at 59-60, 63. In an implicit acknowledgement of this serious problem, both the 2011 and 2014 Rules gave schools whose programs failed the Department's earnings-based tests an opportunity to provide alternative and more accurate earnings data. *See* 76 Fed. Reg. at 34,428-29; 79 Fed. Reg. at 65,010. But that proved insufficient; after cosmetology schools challenged the appeals process, a court concluded that the Department acted arbitrarily and capriciously because it "narrowly circumscribed" that process—*i.e.*, the Department "inexplicably requir[ed] high response rates to submit state-sponsored or survey-based alternate earnings calculations." *AACS*, 258 F.Supp.3d at 56.

But rather than scrap the inaccurate data or improve the appeals process this time, the Department has steadfastly adhered to the use of inaccurate data and scrapped the appeals process altogether. The Department has proclaimed that it will obtain the earnings data necessary to conduct its debt-to-earnings and earnings-premium tests from "a Federal agency with earnings data," and its "current preference" is to use IRS earnings data—data that already has privacy-protective "statistical noise" baked into it, which means that they contain errors to the point that any program "could be erroneously declared ineligible" under Title IV. 88 Fed.

Reg. at 70,045, 70,096-97. And although federal earnings data contain *additional* inaccuracies since they do not account for income underreporting in the cosmetology sector, the Department has declared that it will *not* provide *any* "opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting." *Id.* at 70,042. The end result is that the Department is embarking on its most "wooden" and "problematic" use of federal earnings data yet. *AACS*, 258 F.Supp.3d at 73. The Department, the courts, and other parties have spent the last decade "detailing how bad" federal earnings data are when it comes to cosmetologists, but now the Department is insisting that it will rely solely on that data with their "conceded defects"—all while eliminating every mechanism that it previously thought necessary to avoid intolerably inaccurate results. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019). That is just the sort of "illogic" that the APA does not tolerate. *Chamber of Com.*, 885 F.3d at 382.

Nothing in the district court's decision disturbs that conclusion. The court first suggested that Plaintiffs' concerns are overblown because there is a "lack of underreporting" in the cosmetology sector. ROA.4145. The administrative record says well-nigh the opposite. In reality, the administrative record reveals that underreporting is "prevalent" in the cosmetology sector, that tip income alone is underreported by at least "8-10%," and that "underreporting is not limited to tips." ROA.1166; *see* ROA.1161, 2569 ("Underreporting of income" is an "issue[] with

current workforce earnings data[.]"). That is presumably why, in the 2019 Rule, the Department described underreporting as both a frequent occurrence and the chief reason why reported-income data is "subject to significant errors" for "heavily tip-influenced professions[] such as cosmetology." 84 Fed. Reg. at 31,409-10.

The district court also suggested that the 2023 Rule contains "safeguards against underestimates of earnings"—namely, that the Department will measure earnings "'approximately one year later (relative to when they complete their credential)' than under the 2014 Rule," which will reportedly result in a "20% increase in programs' median earnings amounts" that will "offset … underreported tips." ROA.4145. But even assuming that cosmetologists average a 20% bump in year-3 compared to year-2, and even setting aside that underreporting is not limited to tips, that suggests only that year-3 data will contain even more severe distortions than year-2 data, as nothing in the administrative record suggests that someone who underreports income in year-2 will begin reporting by year-3.

The district court lastly suggested that "new research" had "call[ed] into question the reliability of allowing schools to appeal their earnings data." ROA.4146. But that "new research"—a study financed by an organization opposed to for-profit schools, *see* ROA.298—never suggested that appeals are not administrable. Quite the opposite. Even that research *agreed* that, in an "appeal" process, "a reasonable earnings adjustment would be to allow earnings to be inflated

by" "8-10%" to account for underreported tips—all while conceding that "underreporting is *not* limited to tips." ROA.1166 (emphasis added). And Congress evidently believes that appeals processes are administrable too, as it has required appeals in contexts where it has actually authorized something resembling the 2023 Rule. *See* 20 U.S.C. §1087d(c)(5). The Department's obstinate decision here to use unadjusted federal earnings data to calculate its atextual metrics—all while eliminating the possibility of appeals—thus is "inadequately substantiated," to put it mildly. *MCR Oil Tools, L.L.C. v. DOT*, 110 F.4th 677, 697 (5th Cir. 2024).

**B.      The Department's Earnings-Based Tests Illogically Penalize Schools for Factors Beyond Their Control.**

The Department's repeated reliance on earnings-based tests to operationalize "gainful employment" also fails arbitrary-and-capricious review by punishing schools for factors outside their control. Indeed, the 2023 Rule brands a program a "failure" just because certain groups of alumni have debt-to-earnings ratios that exceed 8% of annual earnings or 20% of discretionary earnings, or if their annual earnings do not exceed those of high-school graduates in the state between the ages of 25 and 34. 88 Fed. Reg. at 70,012. So, like its 2011 and 2014 predecessors, the 2023 Rule hinges on the theory that schools are responsible for their former students' post-graduate "financial outcomes," including everything from their relative earnings to whether they remain in the workforce. *Id.* at 70,011. That makes no sense.

The Department itself reached just that conclusion in the 2019 Rule. As the Department explained then, schools do "*not* have the ability to control for the many variables that impact earnings." 84 Fed. Reg. at 31,409 (emphasis added). "[S]ome students take time out of employment or elect part-time work over full-time work to care for children, care for other family members, manage a personal health condition, start a business, or pursue other personal lifestyle choices," all of which can negatively affect individual earnings. *Id.* at 31,413. Moreover, "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups," such as "women and minorities." *Id.* at 31,414. And "macroeconomic" events like "the Great Recession"—which are "outlier events" and by definition unpredictable—"can have a considerable impact on D/E rates outcomes" and impose "downward pressure on wages." *Id.* at 31,410-11. The Department thus concluded in the 2019 Rule that "[p]enalizing" and "sanction[ing] institutions for aspects of student debt and earning outcomes that are outside of the institution's control" is "absurd." *Id.* at 31,409-10.

The 2023 Rule embraces that absurdity. To be clear, the fact that the rule renders programs ineligible based on factors entirely outside the schools' control, rather than based on the nature of the training supplied in their classrooms, strongly indicates that the Department has not adopted the best reading of the gainful-employment language. *Cf.* pp.17-18, *supra*. But doing so while ignoring all context

is arbitrary and capricious in the extreme.  The 2023 Rule does just that, blaming schools even if graduates themselves "choose" not to work at all or "choos[e] not to work full-time," 88 Fed. Reg. at 70,035, 70,045, or if there are events like the COVID-19 pandemic that depress earnings, *see, e.g.*, *id.* at 70,065, 70,092.  That approach is "seemingly illogical"—because it is illogical.  *Sw. Elec. Power Co.*, 920 F.3d at 1013-14.

The district court barely addressed these arguments.  It first emphasized the Department's theory that the 2023 Rule includes a "buffering" mechanism that responds to "macroeconomic trends" because, "[i]n typical economic downturns, high school graduates' earnings would also fall, maybe even more than earnings of workers with higher levels of education."  ROA.4149.  Setting aside that this explanation relates only to the earnings-premium test and not the debt-to-earnings test, the 2023 Rule makes clear that this so-called buffering mechanism applies only when the earnings of high-school graduates are compared to those of "college graduates," which does not help schools (like cosmetology schools) that do not produce college graduates.  88 Fed. Reg. at 70,058.

The district court next suggested that it is not illogical to hold schools responsible for historical discrimination against women and minorities that suppresses earnings because the Department's analysis showed that those factors are not solely responsible for the reduced earnings.  *See* ROA.4151.  But even the

Department's analysis showed that "demographic variables" are not insignificant—for example, they "explain[] … 7 percentage points of the variation in program-level earnings" in the earnings-premium test. 88 Fed. Reg. at 70,143. And when the Department is already blaming schools for so many other uncontrollable variables—indeed, the Department itself estimates that factors *other* than "school and credential characteristics" are responsible for upwards of 29% and 36% of the variation in the earnings-premium and debt-to-earnings metrics, respectively, ROA.2118-19—this illogical choice just compounds the problems.

The district court's only other reasoning is that the Department has "authority to waive or modify regulatory provisions in the future if needed to respond to exceptional circumstances." ROA.4149. But the only authority cited in the 2023 Rule for this reserved authority is 20 U.S.C. §1098bb(a)(2)(E), *see* 88 Fed. Reg. at 70,058 & n.152, which requires the President of the United States to first declare a national emergency, *see* 20 U.S.C. §1098ee(4). Accordingly, the default approach under the 2023 Rule is to place 100% of the blame on schools for their graduates' earnings *regardless* of what occurs during their post-graduate lives and even if non-emergency external events lead graduates to undergo career shifts or to stop working altogether. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

**C.** **The Department Is Relying on Illogical Debt-to-Earnings Thresholds.**

Although the Department's reliance on fatally flawed *earnings* data dooms both the 2023 Rule's debt-to-*earnings* test and its *earnings*-premium test, the debt-to-earnings test suffers from additional flaws: The Department failed to "adequately justify" its use of the 8% and 20% thresholds. *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023).

In seeking to justify the 8% threshold in the 2023 Rule, the Department stated only that it is "grounded in mortgage-underwriting standards" and then incorporated its explanation for that threshold from the proposed rule. 88 Fed. Reg. at 70,020. The proposed rule in turn copied-and-pasted the explanation for the 8% threshold that appeared in the 2014 Rule. *Compare* 88 Fed. Reg. at 32,326, *with* 79 Fed. Reg. 16,426, 16,443 (Mar. 25, 2014). And the 2014 Rule provided just one citation to support the use of an 8% threshold: the 2006 paper from Baum & Schwartz. *See* 79 Fed. Reg. at 16,443 nn.50-51 (citing Baum & Schwartz 2-3).

But the Baum & Schwartz paper comes nowhere close to justifying an 8% threshold. That is because Baum & Schwartz reviewed the existing studies and then declared that "[t]he shortcomings" of the 8% threshold are readily "apparent" and that such a threshold has "no particular merit or justification," since it does not reflect "the experience of young people who have recently left school," Baum & Schwartz 3—young people who likely do not have a mortgage, *see, e.g.*, Nat'l Ass'n of

Realtors, *2023 Profile of Home Buyers & Sellers* 7 (2023), https://perma.cc/S6EL-NC7N ("The typical first-time buyer was 35 years old this year[.]").  All that explains why the Department emphasized in the 2019 Rule that the Baum & Schwartz paper "*does not support the eight percent threshold*, but instead *clearly refutes it*" in this context.  84 Fed. Reg. at 31,426 (emphases added).  Given that starting point, the Department had a duty in the 2023 Rule to "reasonably explain[]" why an 8% threshold that it had just skewered as hopelessly irrational is suddenly rational.  *CCST v. Dep't of Educ.*, 98 F.4th 220, 246 (5th Cir. 2024).  But the 2023 Rule fails to do so.  In fact, the Department does not even "display awareness that it is changing position" vis-à-vis the 8% figure.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

This shortcoming alone undermines the debt-to-earnings test *in toto* since that test cannot "function sensibly" without the 8% threshold—and the Department has never suggested otherwise.  *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).  But the 20% threshold is equally problematic.  At the outset, even Baum & Schwartz deemed that figure "somewhat arbitrary," Baum & Schwartz 12—hardly a promising start in an APA case.  Baum & Schwartz also made clear that their somewhat-arbitrary 20% threshold "should be used thoughtfully with modification for family size" (among other variables).  ROA.[Baum&Schwartz.12].  But the 2023 Rule does nothing of the sort.  Rather, the Department has adopted an

approach that assesses debt *only* in relation to the earnings of the "*graduates*" themselves. 88 Fed. Reg. at 70,005 (emphasis added). As the 2019 Rule highlighted, this approach means that programs can fail the 20% threshold even if their graduates' "household earnings" are more than "adequate to support a family without needing the graduate to work outside of the home"—*e.g.*, $1 million/year. 84 Fed. Reg. at 31,410. Five years ago, the Department found it "absurd" to embrace such a test. *Id.* The Department failed to offer a reasoned explanation why it should indulge such absurdities now.

The district court nevertheless upheld the 8% and 20% thresholds on the theory that, regardless of the defects of each when applied "separately," the thresholds are "more than reasonable" "when applied together." ROA.4148. Two wrongs never make a right, in life or in administrative law. More to the point, the court's "arbitrary + arbitrary = reasonable" alchemy improperly "substitute[d]" the court's own "judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), because that (il)logic appears nowhere in the 2023 Rule itself. *But see BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910-11 (5th Cir. 2023) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

**D.     The Department's Cost-Benefit Analysis Is Illogical.**

Last but certainly not least, the Department's cost-benefit analysis is irrational.  Cost-benefit analysis is an "important aspect of the problem" when agencies regulate, and an agency thus must "adequately substantiate[]" "benefits" that 'bear a rational relationship to the … costs imposed.'" *Chamber of Com. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023).  The Department flouted that obligation here too.

The costs imposed on cosmetology schools by the Department's regulation are enormous.  As the Department has never disputed, *only 13* of the 1,270 cosmetology programs now eligible for Title-IV funding are projected to pass the 2023 Rule's tests, while 638 programs that enroll some 80% of students in Title-IV-eligible programs are projected to fail.  *See* p.23, *supra*.  Such extraordinary costs—in a sector that the federal government expects to "grow 7 percent from 2023 to 2033, faster than the average for all occupations," U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook:  Barbers, Hairstylists, and Cosmetologists*, https://perma.cc/8QCL-94SV—require the Department to establish commensurate benefits.  *See Mexican Gulf Fishing*, 60 F.4th at 973.  The agency did not do so.

The district court agreed (with considerable understatement) that the 2023 Rule "will change the future for many cosmetology schools," but held that the Department had reasonably explained that its heavy-handed regulation would

"significantly benefit students" by encouraging them to enroll in "[b]etter-performing programs." ROA.4150. That theory is irreconcilable with the administrative record too. As explained, most cosmetology programs in the Department's dataset are likely to lose Title-IV eligibility, and the Department offered no evidence that the remaining minority can accommodate the 150,000+ students currently attending "failing" programs. *See* 88 Fed. Reg. at 70,138, 70,140. More fundamentally, the so-called "better-performing programs" are programs that the Department *did not actually evaluate* because of an insufficient "n-size." *See id.* at 70,127. So, even assuming that those other programs have extra capacity (and will resist the temptation to cap enrollment to avoid coming within range of the Department's lethal tests), the Department ultimately has no idea whether those schools are performing even *worse* than those deemed failures by the Department. Courts may not "defer to the agency's conclusory or unsupported suppositions." *State v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) (per curiam). Just so here.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
  *Counsel of Record*
ANDREW C. LAWRENCE
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellants Ogle School Management LLC; Tricoci University of Beauty Culture, LLC; and American Association of Cosmetology Schools*

March 23, 2026

## CERTIFICATE OF COMPLIANCE

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses. March 23, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 23, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement<br>
Paul D. Clement