# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

American Association of Cosmetology Schools; Ogle School Management, L.L.C.;
Tricoci University of Beauty Culture, L.L.C.; DuVall's School of Cosmetology, L.L.C.,
Plaintiffs-Appellants,

v.

United States Department of Education; Linda McMahon, Secretary, U.S.
Department of Education, in her official capacity,
Defendants-Appellees.

Ogle School Management, L.L.C.; Tricoci University of Beauty Culture, L.L.C.,
Plaintiffs-Appellants,

v.

United States Department of Education; Linda McMahon, Secretary, U.S.
Department of Education, in her official capacity,
Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLEES

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS PULHAM
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees agree with appellants that oral argument could assist the Court in resolving the issues presented by this case.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ........................................................................3

STATEMENT OF THE ISSUES............................................................................4

STATEMENT OF THE CASE................................................................................4

    A.    Legal and Factual Background........................................................4

    B.    Procedural Background..................................................................13

SUMMARY OF ARGUMENT.............................................................................. 15

STANDARD OF REVIEW ................................................................................... 19

ARGUMENT ....................................................................................................... 19

I.    The Rule Comports with the Statute................................................... 19

    A.    The Rule Properly Implements the Statutory Gainful-
        Employment Requirement by Focusing on Whether a Program's
        Graduates Actually Obtain Profitable Employment................................20

    B.    Plaintiffs' Additional Contrary Arguments Are Unpersuasive .................28

II.    The Rule Is Reasonable and Reasonably Explained ............................................ 35

CONCLUSION ........................................................................................... 52

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Associated Builders & Contractors of Tex., Inc. v. NLRB,*
826 F.3d 215 (5th Cir. 2016) ....................................................................45

*Association of Priv. Sector Colls. & Univs. v. Duncan,*
681 F.3d 427 (D.C. Cir. 2012) .......................................................4-5, 5, 24

*Association of Priv. Sector Colls. & Univs. v. Duncan,*
640 F. App'x 5 (D.C. Cir. 2016) .......................................................... 25, 30

*Association of Priv. Sector Colls. & Univs. v. Duncan,*
870 F. Supp. 2d 133 (D.D.C. 2012) ..................................................... 25, 26

*Corley v. United States,*
556 U.S. 303 (2009) ................................................................................22

*Environmental Def. v. Duke Energy Corp.,*
549 U.S. 561 (2007) ................................................................................30

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ................................................................................35

*Finnbin, LLC v. Consumer Prod. Safety Comm'n,*
45 F.4th 127 (D.C. Cir. 2022) ..................................................................36

*Handley v. Chapman,*
587 F.3d 273 (5th Cir. 2009) ...................................................................35

*Jackson v. Modly,*
949 F.3d 763 (D.C. Cir. 2020) ..................................................................27

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
60 F.4th 956 (5th Cir. 2023) ....................................................................49

*National Fed'n of the Blind of Tex., Inc. v. Abbott,*
647 F.3d 202 (5th Cir. 2011) ...................................................................19

*West Virginia v. EPA,*
597 U.S. 697 (2022) ................................................................................34

**Statutes:**

National Defense Education Act of 1958,
  Pub. L. No. 85-864, § 103(b), 72 Stat. 1580....................................................6

National Vocational Student Loan Insurance Act of 1965,
  Pub. L. No. 89-287, § 17(a), 79 Stat. 1037 ...................................................6

Pub. L. No. 119-21, 139 Stat. 72, (2025):
  § 84001, 139 Stat. at 353 ............................................................... 12, 27
  § 85001, 139 Stat. at 355 ..............................................................27
  § 85002, 139 Stat. at 356 ..............................................................27

20 U.S.C. § 1001 *et seq.*....................................................................4

20 U.S.C. § 1002(b)-(c) ...........................................1, 7, 15, 19, 20, 21, 22, 23

20 U.S.C. § 1036(e)(1)(B)(ii)..............................................................30

20 U.S.C. § 1070 *et seq.*....................................................................4

20 U.S.C. § 1085(a)(2) .....................................................................29

20 U.S.C. § 1085(m)(1) ....................................................................29

20 U.S.C. § 1085(m)(1)(A)................................................................32

20 U.S.C. § 1087c(b) .........................................................................6

20 U.S.C. § 1087d(a)(7).................................................................. 5, 24

20 U.S.C. § 1087d(c)..........................................................................12

20 U.S.C. § 1087d(c)(2)......................................................................12

20 U.S.C. § 1087d(c)(3)(A) ................................................................12

20 U.S.C. § 1094(a)............................................................................5

20 U.S.C. § 1094(c)............................................................................6

20 U.S.C. § 1094(c)(1)(B)...................................................................24

20 U.S.C. § 1221e-3...........................................................................6

20 U.S.C. § 3474 ....................................................................................................6

28 U.S.C. § 1291 ....................................................................................................3

28 U.S.C. § 1331 ....................................................................................................3

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .....................................................................................3

Fed. R. App. P. 4(a)(3).............................................................................................3

**Legislative Materials:**

H.R. Rep. No. 89-308 (1965)......................................................................... 7, 25

S. Rep. No. 89-758 (1965) .........................................................................7, 25, 26

**Other Authorities:**

*Employment*, Black's Law Dictionary (12th ed. 2024)........................................22

*Employment*, The Random House Dictionary of the English Language
    Unabridged (2d ed. 1987)..............................................................................22

76 Fed. Reg. 34386 (June 13, 2011) ............................................................ 33, 34

84 Fed. Reg. 31392 (July 1, 2019) .......................................................................48

88 Fed. Reg. 32300 (May 19, 2023) ........................................................46, 47, 48

88 Fed. Reg. 70004 (Oct. 10, 2023) .................. 4, 5, 7, 8, 9, 10, 11, 12, 32, 34, 37, 38, 39,
                                                      40, 41, 42, 43, 44, 46, 47, 48, 49, 50, 52

91 Fed. Reg. 21088 (Apr. 20, 2026) ....................................................................13

*Gainful*, Black's Law Dictionary (4th ed. 1968) .................................................20

*Gainful*, Oxford English Dictionary (2d ed. 1989)..............................................21

*Gainful*, The Random House Dictionary of the English Language
    Unabridged (2d ed. 1987)..........................................................................20-21

# INTRODUCTION

Under Title IV of the Higher Education Act, the Department of Education provides more than $100 billion annually in assistance to students who attend postsecondary institutions. Most of that assistance comes in the form of loans, which the Department generally expects recipients to repay; when they do not, it is taxpayers who bear the cost. And recognizing the enormous federal investment that Title IV programs represent, Congress has included provisions throughout reflecting a desire to ensure that federal funds are being used responsibly and providing the Secretary with substantial discretion to establish restrictions and requirements to ensure that those funds are repaid.

One such restriction applies to for-profit and vocational programs. As relevant here, such programs may qualify to participate in Title IV only if they "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)-(c). In recent years, however, the Department has observed that many graduates of such programs are not able to repay the loans that they obtain to finance their attendance, thereby shifting the burden of their education to taxpayers.

As a result, in 2023, the Department promulgated the Rule at issue in this case. Among other measures designed to protect students and the public fisc, the Rule establishes two metrics to determine whether a for-profit or vocational program meets the statutory gainful-employment requirement. At a high level, one metric—

called the "debt-to-earnings ratio"—assesses the typical graduate's debt in relation to his earnings. If there is too much debt compared to earnings, such that the typical program graduate may not be able to repay his loans, then the program fails that metric. The other metric—called the "earnings premium"—assesses the typical graduate's earnings relative to the earnings of a high school graduate with no postsecondary education. If that premium is too low, such that completing the vocational training has not increased the typical graduate's earning power, then the program fails that metric. And if any program fails the same metric in two out of three years, then it is deemed ineligible for further participation in Title IV.

As the district court correctly held, the Rule's framework comports with the statute. "Gainful" employment is not—as plaintiffs would have it—"any" employment. It is instead lucrative or profitable employment. And employment that is not sufficiently remunerative to allow a graduate to repay his loans is not lucrative or profitable in context. Nor is employment that requires a significant investment in vocational training to obtain but that pays no more than a typical high school graduate without postsecondary education or training earns.

That conclusion is only reinforced by the statutory context. Throughout, the Higher Education Act reflects Congress's concern with minimizing the possibility that Title IV student assistance will unduly burden the public fisc. And plaintiffs' view— that vocational and for-profit programs may continue to receive tuition funded by federal money even when most of their graduates do not obtain employment that

enables them to repay those loans or otherwise improves their financial condition—is entirely incompatible with Congress's choices. Nor do plaintiffs offer any plausible reason why Congress would want to enrich such schools at the expense of the students and taxpayers who bear the consequences of default.

Beyond that, plaintiffs attempt to nitpick the specific choices made by the Department—complaining, for example, that the Department will use federal taxpayer data (rather than surveys submitted by the schools themselves) as the source of its information about graduates' earnings. But as the district court explained, the Department carefully considered objections like those raised by plaintiffs and provided a thorough explanation for the choices that plaintiffs now second-guess. The Rule is thus reasonable and reasonably explained, and the district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this suit under 28 U.S.C. § 1331. The district court granted the government's motion for summary judgment and entered final judgment on October 2, 2025. ROA.4160. Plaintiffs filed timely notices of appeal on November 24, 2025, and December 5, 2025. ROA.4164-67; *see* Fed. R. App. P. 4(a)(1)(B) (providing that all parties have 60 days to file a notice of appeal in civil cases involving the United States); *see also* Fed. R. App. P. 4(a)(3) (providing that "[i]f one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days"). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The questions presented are:

1. Whether the Rule's interpretation of the statutory gainful-employment requirement comports with the statute; and

2. Whether the Rule is reasonable and reasonably explained.

## STATEMENT OF THE CASE

### A.     Legal and Factual Background

1. The Higher Education Act is the principal federal law governing the Department of Education's regulation of institutions that provide postsecondary education. *See* 20 U.S.C. § 1001 *et seq.* Title IV of the statute covers the Department's provision of assistance to students to help them access higher education. This assistance takes various forms but primarily consists of grants and loans. *See id.* § 1070 *et seq.*

The total economic effect of the Department's Title IV spending is extremely large. Each year, the Department issues "well over $100 billion in new Pell Grants and Direct Loans"—with "the lion's share of th[at] amount" coming from loans. 88 Fed. Reg. 70004, 70004 & n.1 (Oct. 10, 2023); *see also id.* at 70103, 70107 (stating that in 2022, the Department provided approximately $72 billion in student loans). And as of 2023, there were more than $1.6 trillion in outstanding student loans. *See id.* at 70006. When borrowers do not earn sufficient income to repay the full costs of their loans, their failure to do so "shifts their tuition costs onto taxpayers." *Association of Priv. Sector*

4

*Colls. & Univs. v. Duncan*, 681 F.3d 427, 435 (D.C. Cir. 2012); *see also* 88 Fed. Reg. at 70004-05.

Although students are the intended beneficiaries of Title IV assistance, the Department's provision of that assistance benefits schools as well, because "schools receive the benefit of accepting tuition payments from students receiving federal financial aid." *Duncan*, 681 F.3d at 435. But unlike students and taxpayers, schools do not directly suffer when their graduates who received assistance from the Department are unable to repay their loans. Instead, schools keep their students' tuition payments—including tuition payments financed with taxpayer funds through Title IV assistance—"regardless of whether those students are ultimately able to repay their loans." *Id.*

Congress has thus "codified statutory requirements in the" Higher Education Act "to ensure against abuse by schools," *Duncan*, 681 F.3d at 435, and has generally provided the Secretary with broad discretionary authority to establish and administer requirements for participation in Title IV. Congress has limited Title IV participation to "eligible" schools and has required schools, as a condition of participation, to "enter into a program participation agreement with the Secretary" that ensures "compliance with" various requirements. 20 U.S.C. § 1094(a); *see also id.* § 1087d(a)(7) (providing that program participation agreements may include provisions that "the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" Title IV). Congress has also directed the Secretary to

5

"prescribe such regulations as may be necessary" for "the establishment of reasonable standards of financial responsibility," including "any matter the Secretary deems necessary to the sound administration of the financial aid programs." *Id.* § 1094(c). And as part of the process of selecting programs for participation in Title IV assistance, the Secretary is empowered to prescribe "eligibility requirements" that programs must meet. *Id.* § 1087c(b). These specific discretionary grants of authority to the Secretary are in addition to the general authority that Congress has vested in the Secretary to issue rules that are necessary or appropriate for implementing the Department's operations. *See generally id.* §§ 1221e-3, 3474.

In addition, Congress has identified specific eligibility requirements that proprietary (that is, for-profit) and vocational programs must meet in order to be eligible for participation in Title IV. When Congress established the first federally funded student loan program in 1958, it restricted participation to public or nonprofit institutions that provided either a bachelor's degree or a course of study that earned a student credit toward a bachelor's degree. *See* National Defense Education Act of 1958, Pub. L. No. 85-864, § 103(b), 72 Stat. 1580, 1582. Seven years later, Congress extended certain loan-related benefits to students enrolled in technical or vocational schools that, among other requirements, provided "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations." National Vocational Student Loan Insurance Act of 1965, Pub. L. No. 89-287, § 17(a), 79 Stat. 1037, 1048. In enacting that legislation, Congress

6

focused on evidence that most vocational and technical students found employment that enabled them to repay any student loans that they received. *See* S. Rep. No. 89-758, at 3-12 (1965); H.R. Rep. No. 89-308, at 3-9, 11 (1965). And in the current version of the statute, Congress has retained the connection between for-profit and vocational programs' eligibility for Title IV assistance and the ability of program graduates to secure profitable employment that will enable them to repay their loans. Thus, such programs may qualify to participate if (as relevant here) they "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)-(c).

2. For years, the Department has recognized that, although Title IV assistance enables many students to access the benefits of postsecondary education, a substantial number of students who receive assistance—especially student loans—struggle with their debt loads after graduation. As the Department has explained, the benefits of postsecondary education and training "are not guaranteed"; instead, the returns on such education "vary dramatically across institutions and among programs." 88 Fed. Reg. at 70004. Although "[m]ost postsecondary programs" provide sufficient economic benefits to students to justify the cost of attendance, "too many programs fail to increase graduates' wages, having little or even negative effects on graduates' earnings." *Id.* And some programs compound the problem by "charg[ing] much higher tuition than similar programs," which leads "students to borrow much more than they would have needed had they chosen a more affordable program." *Id.*

Moreover, students' use of federal assistance to finance the cost of attending postsecondary programs "creates significant risk for borrowers and the Federal Government (as well as taxpayers)." 88 Fed. Reg. at 70004. From borrowers' perspective, low postsecondary earnings may lead to "difficulty in repaying their loans" and the possibility of default, both of which have substantial negative effects on the borrowers. *Id.* And when borrowers do not earn sufficient income to repay the full costs of their loans, their failure to do so creates a significant burden on the Department and, ultimately, the taxpayers who finance the Department's financial assistance programs. *Id.* at 70004-05; *see also id.* at 70012-13.

In recent years, there has been an ever-increasing amount of outstanding student loan debt owed to the Department and a high number of defaults. Between 2014 and 2023, the total amount of outstanding Title IV loans increased by nearly 50%, to more than $1.6 trillion. 88 Fed. Reg. at 70006. And in the years before 2020 (when the Department paused student loan payments and interest as a result of COVID-19), there were "more than 1 million new Direct Loan defaults" each year. *Id.*

In light of the growing problem of graduates who are unable to repay their loans and the negative consequences for students and taxpayers alike, the Department began in 2011 to establish metrics implementing the gainful-employment requirement that proprietary and vocational programs must meet to ensure eligibility for Title IV assistance. Over the last 15 years, the Department has issued a series of rules

establishing, amending, or repealing various such requirements. *See generally*

ROA.4132-33 (recounting this history).

Most recently, in 2023, the Department promulgated the Rule at issue in this

case. The Rule contains a number of provisions designed to ensure that students make

informed, financially responsible decisions and, where possible, that taxpayer funds

are not used to prop up postsecondary programs whose graduates do not generally

attain income sufficient to repay their loans.

First, the Rule establishes a new Department website to provide students with

information about the financial value of postsecondary education programs. On that

website, the Department will report two financial metrics for all Title IV-eligible

programs with a sufficient number of graduates. First, the Department will report

each program's "earnings premium," which generally measures the extent to which

the "typical program graduates experience" higher incomes than "typical high school

graduates." 88 Fed. Reg. at 70005. In other words, this measure reflects how much

additional earnings potential the typical graduate generates by completing the

program. Second, the Department will report each program's "debt-to-earnings ratio,"

which compares the typical graduate's debt burden to her earnings. *Id.* In other words,

this measure reflects the extent to which typical graduates are able to earn sufficient

income to pay back any debt that they incurred to attend the school. This portion of

the Rule is not at issue in this appeal.

Second, the Department determined that additional measures were required for the so-called "gainful employment programs" that are statutorily eligible for Title IV assistance only so long as they "provide training that prepares students for gainful employment in a recognized occupation or profession." 88 Fed. Reg. at 70005. Those programs "include nearly all educational programs at for-profit institutions of higher education, as well as non-degree programs at public and private nonprofit institutions such as community colleges." *Id.* As the Department explained, notwithstanding the statutory gainful-employment requirement—which should mean that "labor market outcomes are central to their mission"—such programs actually "account for a disproportionate share of students who complete programs with very low earnings and unmanageable debt." *Id.* at 70006-07.

To combat these problems, the Rule establishes two metrics that gainful employment programs must meet to retain their eligibility for Title IV assistance. These metrics—which mirror the metrics that will be reported for most Title IV programs through the Department's website, as explained above—"tie program eligibility to whether" the programs "provide education and training to their" students that result in "earnings beyond those of high school graduates and sufficient to allow students to repay their student loans." 88 Fed. Reg. at 70008.

In particular, under the "debt-to-earnings" metric, a program fails if "the median program graduate devotes" both more than "8% of their annual earnings" and also more than "20% of discretionary earnings" (that is, those earnings above 150%

of the federal poverty level) to student debt payments. ROA.4133; *see also* 88 Fed. Reg. at 70188-89. As the district court explained, this metric "seeks to measure the unmanageable debt incurred by graduates of gainful-employment programs," essentially asking "how much of a graduate's earnings will go toward student loan payments." ROA.4133 (quotation omitted). In addition, under the "earnings premium" metric, a program fails if "the median program graduate earns less than the median high school graduate in the state who is aged 25–34 and never enrolled in postsecondary education." ROA.4133-34; *see also* 88 Fed. Reg. at 70188. This metric essentially measures "how much better off financially" the graduate is as a result of "having completed [the] program." ROA.4134.

If a program fails a metric once, it is required to "provide warnings to current and prospective students." ROA.4134. If a program fails the same metric in any two out of three consecutive years, the program will lose its eligibility for Title IV assistance. 88 Fed. Reg. at 70192.

As the Department explained, the Rule's focus on ensuring that programs' graduates typically attain sufficiently remunerative jobs coheres with the gainful-employment statutory criterion. "[A] program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable debt, or if they earn no more than comparable high school graduates." 88 Fed. Reg. at 70012. To the contrary, students in those programs "receive no financial gain, and may even experience financial loss, as a result of attending their

11

career training programs." *Id.* And if a school's graduates are consistently unable to secure profitable employment following completion of the program, it is natural to conclude that "those students were, in fact," not "adequately prepared" for gainful employment by the program. *Id.* (quotation omitted).

3. In July 2025, Congress amended the Higher Education Act to include new requirements that certain institutions—those offering undergraduate degrees, graduate or professional degrees, or graduate certificates—must meet to be eligible to participate in the Department's direct loans program. *See* Pub. L. No. 119-21, § 84001, 139 Stat. 72, 353 (2025) (codified at 20 U.S.C. § 1087d). Under that new statutory requirement, an institution generally loses eligibility if, in two out of three consecutive years, its students' median earnings four years after graduation are less than the median earnings of certain comparator groups. *See* 20 U.S.C. § 1087d(c)(2). For undergraduate programs, the comparator group is drawn from working adults who hold a high school diploma or the equivalent; for graduate and professional programs, the comparator group is drawn from working adults who hold baccalaureate degrees. *See id.* § 1087d(c)(3)(A).

In many respects, the new metric established by Congress mirrors the earnings premium metric established in the Rule. Congress has, however, provided detailed instructions regarding how to calculate and implement the statutory metric, which do not reflect the Rule's choices in all their particulars. *See* 20 U.S.C. § 1087d(c). The Department has thus recently issued a Notice of Proposed Rulemaking which would,

12

if adopted, both implement the new statutory metric for programs covered by that statute and amend the gainful-employment regulations to "harmonize those regulations" with the new requirements. *See* 91 Fed. Reg. 21088, 21088 (Apr. 20, 2026).

### B.     Procedural Background

Plaintiffs are an association of for-profit cosmetology schools, along with three individual cosmetology schools. ROA.2721-22; ROA.4205. Plaintiffs filed two separate suits challenging the Rule, which the district court consolidated. *See* ROA.5148.

As relevant here, plaintiffs claim that the Rule contradicts the statute by imposing requirements related to graduates' earnings following completion of the program, which plaintiffs believe are not properly grounded in the statute. ROA.2754; ROA.4228-40. And plaintiffs claim that various specific features of the Rule's framework, such as the particular thresholds and data sources, are arbitrary and capricious. ROA.2753-54; ROA.4240-56.[1]

The district court granted summary judgment to the Department. First, the court concluded that the Rule comports with the statute. The court explained that "[d]ictionary definitions of 'gainful' reveal it means 'profitable,' 'advantageous,' or

---

[1] Some plaintiffs also claimed in district court that the Rule suffers from various additional flaws, including that it allegedly violates plaintiffs' due process, equal protection, and First Amendment rights. ROA.2754-62. Plaintiffs do not renew those contentions in their opening briefs.

'lucrative.'" ROA.4141. Thus, the court held, the Rule's provisions properly implement the statutory gainful-employment requirement by ensuring that programs receiving Title IV funds "lead to profitable jobs, instead of loan deficits." ROA.4141; *see also* ROA.4140 (endorsing the Department's argument "that students are not prepared for gainful employment if a program is designed to leave its graduates financially worse off than when they started, and unable to repay their loans"). And the court noted that multiple provisions of the statute provide the Secretary with discretionary authority to prescribe regulations that are necessary for proper administration of Title IV's programs, which the court held encompasses the authority to prescribe the requirements that plaintiffs challenge. ROA.4141.

Next, the district court rejected plaintiffs' various arguments that the Rule's specific data sources and thresholds reflect arbitrary and capricious decisionmaking. The court explained that the Department "reasonably chose" to rely on graduates' "reported earnings as the best available data" and "fully explained" its conclusion that income "underreporting is likely not as widespread as Plaintiffs claim." ROA.4144-45. In addition, the Department "carefully pointed out five specific ways that" the Rule's approach is "designed to include safeguards against underestimates of earnings." ROA.4145 (quotation omitted). And the Department properly justified the Rule's 8% and 20% thresholds by "point[ing] to studies which actually show that" those thresholds, "if anything, are too generous to" plaintiffs. ROA.4148.

The district court therefore granted the Department's motion for summary judgment, denied plaintiffs' motions, and entered final judgment. ROA.4160. This appeal followed.

## SUMMARY OF ARGUMENT

I. Under the Higher Education Act, for-profit and vocational programs may participate in Title IV assistance programs if they "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)-(c). The Rule reflects the Department's determination that, to satisfy the statutory gainful-employment requirement, a program's typical graduates must obtain sufficiently remunerative employment to pay back their loans and justify their investment in the program.

As the district court correctly held, the Rule's interpretation comports with the statute. The plain meaning of "gainful" is "profitable" or "lucrative." A program does not lead to profitable or lucrative employment in context if its graduates typically obtain jobs that do not allow them to repay the costs of the program. Similarly, if a program's graduates typically obtain jobs that are no more remunerative than the jobs typically obtained by high school graduates with no postsecondary education, that program has not prepared the graduates to obtain lucrative employment. And that understanding of the statute is the only way to avoid rendering the statutory word "gainful" impermissibly superfluous.

The relevant context and history point in the same direction. The federal government distributes enormous sums through Title IV, and when those loans are not repaid, the cost of default is borne by taxpayers. Thus, Title IV incorporates statutory requirements—and provides substantial discretion to the Secretary to adopt regulations—to safeguard the public investment. The Rule's understanding of the gainful-employment requirement is consistent with that context, by helping to ensure that Title IV assistance is provided to students who will generally be able to repay those funds. And indeed, when Congress originally extended eligibility for federal student assistance programs to vocational and technical programs, it was specifically concerned with ensuring that graduates of those programs would generally obtain sufficiently lucrative employment to repay the costs of the program.

Finally, to the extent there were any doubt about the validity of the Rule's interpretation, Congress recently resolved that doubt by effectively endorsing and extending the Rule's principles. Last year, after the Rule was issued, Congress amended the statute to impose earnings requirements quite similar to one of the Rule's metrics on institutions offering undergraduate degrees, graduate or professional degrees, or graduate certificates (but not undergraduate certificates, such as those offered by many of the vocational programs covered by the Rule). In applying those principles to additional institutions, Congress left the Rule itself undisturbed, effectively ratifying the Rule's framework for the programs it covers.

II. The Rule is also reasonable and reasonably explained, as the district court correctly held. Although plaintiffs take issue with the Department's choices regarding, for example, the source of income data that the Department will use and the specific thresholds it will apply, the Department specifically justified each of those choices with a reasonable explanation and after considering relevant comments. That is all the APA requires.

The Department reasonably chose to use federal earnings data, probably from the IRS, to determine graduates' income. Although plaintiffs assert that cosmetologists will often (unlawfully) under-report their income for tax purposes, the Department extensively considered that specific issue and determined that it was still appropriate to use that data. The Department explained that federal taxpayer data reflects the best available data, that such data is used by the Department in administering other aspects of Title IV, that plaintiffs' preferred alternative of allowing schools to self-report their graduates' income is likely to result in over-reporting of earnings, and that it would be inappropriate to effectively reward programs whose graduates unlawfully fail to report their income. The Department identified and credited evidence that under-reporting is relatively minor and explained that it had built buffers into the Rule's framework that more than outweigh the expected under-reporting.

The Department is not unreasonably punishing schools for factors outside their control, such as graduates' choices and macroeconomic conditions. For one, the

Rule's framework does not reflect any attempt to punish or shut down programs; instead, the framework is aimed at safeguarding taxpayer investments in Title IV assistance. And plaintiffs nowhere dispute that the Rule's metrics are reasonably related to that goal. Regardless, the Department reasonably determined that the outlier outcomes identified by plaintiffs did not undermine the Rule.

The Department also reasonably chose to set the Rule's thresholds at 8% of total income and 20% of discretionary income. Those thresholds are drawn originally from economic literature that describes the maximum percentage of income that should be devoted to non-mortgage debt. The Department then applied its own expertise to determine that those thresholds were appropriate to apply in this specific context. And the Department explained that it would include additional safeguards to ameliorate any possibility that each threshold might be too harsh individually.

Finally, the Rule's cost-benefit analysis more than justified the Department's decision to adopt the Rule. The Department determined that the Rule's framework will save approximately $14 billion in taxpayer funds and will have substantial additional benefits for students who might otherwise be saddled with unmanageable debt. Those benefits more than justify any costs to the Rule. And although plaintiffs assert that most cosmetology programs will fail the Rule's metrics and be forced to close, Title IV eligibility is not a pre-requisite for establishing or maintaining a cosmetology program. To the contrary, many cosmetology programs do not participate in Title IV assistance at all and programs that fail the metrics may continue

to exist without participating in Title IV. The asserted costs of the Rule that plaintiffs identify are thus dramatically overblown.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See National Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

## ARGUMENT

### I.    The Rule Comports with the Statute

Congress has provided that for-profit and vocational programs may qualify to participate in Title IV assistance if (as relevant here) they "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)-(c). In the main, the Rule's gainful-employment provisions reflect the Secretary's determination that a program may only meet that requirement if its graduates typically obtain profitable—that is, gainful—employment following their participation in the program.

In plaintiffs' view, the Rule's focus on whether program graduates typically obtain profitable employment does not comport with the statute's gainful-employment requirement. Instead, they contend, the statute only permits the Secretary to consider whether the training a program provides is "designed to" prepare students for gainful employment in a recognized field, Br. 31, even if literally none of the program's graduates obtain employment (much less profitable employment) in that field after graduation. Or, alternatively, they argue that any paid employment—

19

regardless of whether it leaves the graduate better off than before or in a position to repay the costs of his education—necessarily qualifies as "gainful employment" under the statute. *See, e.g.*, Br. 42.

As the district court properly recognized, the Secretary's understanding of the statute is correct. The statute does not require the Department to continue expending taxpayer funds to support for-profit vocational schools whose graduates do not typically earn sufficient incomes to justify (or repay) that investment. That common-sense conclusion is confirmed by the statutory text, context, and history.

### A. The Rule Properly Implements the Statutory Gainful-Employment Requirement by Focusing on Whether a Program's Graduates Actually Obtain Profitable Employment

1. As the district court correctly concluded, the Rule comports with the plain text of the statute by focusing on whether a typical program graduate obtains sufficiently lucrative employment to justify the investment in the program. The statute provides that, to maintain eligibility for Title IV, programs must "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)-(c).

"[G]ainful employment" is not "any employment." Instead, "[d]ictionary definitions of 'gainful' reveal it means 'profitable,' 'advantageous,' or 'lucrative.'" ROA.4141 (quoting *Gainful*, Black's Law Dictionary (4th ed. 1968)); *see also, e.g.*, *Gainful*, The Random House Dictionary of the English Language Unabridged (2d ed.

20

1987) (defining "gainful" as "profitable; lucrative"); *Gainful*, Oxford English Dictionary (2d ed. 1989) (defining "gainful" as "[p]roductive of gain or profit; profitable, advantageous" and "[l]eading to pecuniary gain; lucrative, remunerative"). And, at least at points, plaintiffs seem to agree. *See* Br. 41 ("No one is disputing that gainful is synonymous with profitable.").

As the district court explained, the Rule's framework flows naturally from that plain meaning of "gainful": the Rule "ensur[es] the programs" eligible for Title IV assistance "lead to profitable jobs, instead of loan deficits." ROA.4141. If a program's graduates typically obtain jobs that do not provide them sufficient income to repay the costs of the program, those jobs are not gainful in context; that is, they are not profitable or lucrative or remunerative. Similarly, if a program's graduates typically obtain jobs that pay the same amount or less than the jobs typically obtained by workers with no postsecondary education, that program has not—particularly considering the investment required to attend the program—prepared its graduates to obtain profitable or lucrative employment. In other words, by focusing on whether a school provides "training" and "prepar[ation]" for "gainful employment in a recognized occupation," 20 U.S.C. § 1002(b)-(c), the statute makes clear that the purpose of the requirement is to ensure that schools are improving students' ultimate job prospects and income over what they would be in the absence of any such postsecondary education—rather than merely preparing students to obtain any job at any salary, no matter how low.

Moreover, that understanding of the statute is the only way to ensure that "effect is given to all [the statute's] provisions, so that no part will be inoperative or superfluous"—"one of the most basic interpretive canons." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation omitted). In plaintiffs' view, the statutory term "gainful employment" refers to any work that is "paid" rather than "voluntary." Br. 42. But of course, "paid work" is the definition of "employment," standing alone. *See, e.g.*, *Employment*, Black's Law Dictionary (12th ed. 2024) (defining "employment" as "the condition of having a paying job" or "[w]ork for which one has been hired and is being paid by an employer"); *Employment*, The Random House Dictionary of the English Language Unabridged (2d ed. 1987) (defining "employment" as "an occupation by which a person earns a living; work; business"). Plaintiffs' interpretation thus renders the term "gainful" impermissibly superfluous.

Moreover, although plaintiffs try to avoid this problem by suggesting that "employment" standing alone may refer to unpaid activity such as "knitting," Br. 44 n.11 (quotation omitted), it defies belief to think that Congress would have worried that the term "employment"—in a statute about vocational programs—might be misunderstood as encompassing knitting and other hobbies. And even if such a suggestion were plausible in the abstract, it would be undercut in any event by the additional statutory requirement that the employment be "in a recognized occupation." 20 U.S.C. § 1002(b)-(c). A hobbyist's "knitting" for fun plainly does not qualify.

Nor are plaintiffs correct when they contend (at 31) that the relevant statutory language only requires that they "provide instruction designed to" prepare students for paying work—rather than instruction that in fact prepares students to obtain and perform such work. In articulating that understanding of the statute, plaintiffs insert additional language; their proposed "designed to" qualifier appears nowhere in the statutory text. Instead, the statute requires that programs actually provide "training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)-(c). And if a program's graduates typically do not obtain employment that is more lucrative than they could have obtained without the vocational training, it is natural to conclude that the program does not in fact prepare those students for such employment. Similarly, if a program costs so much that its graduates are typically unable to obtain employment sufficient to enable them to repay the costs, that program does not, in context, in fact prepare its students for profitable employment.

2. That conclusion is confirmed by the statutory context and history, each of which makes clear that Congress did not intend for Title IV assistance to redistribute funds from taxpayers to for-profit schools whose graduates do not typically obtain sufficiently remunerative employment to justify the public's investment in their education.

As explained, Title IV assistance reflects an enormous taxpayer investment—more than $100 billion annually—in students' education. Most of those funds are dispersed in the form of loans that are expected to be repaid, with the cost of default

23

borne by federal taxpayers. Thus, the statutory requirements for Title IV eligibility "are intended to ensure that participating schools actually prepare their students for employment, such that those students can repay their loans" and the burden of their education does not fall on the taxpayer. *Association of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 434 (D.C. Cir. 2012). Consistent with that intent, Congress has repeatedly authorized the Secretary to take action, through a variety of mechanisms, to safeguard the public investment in Title IV programs. Congress has, for example, authorized the Secretary to require schools to agree, as a condition of participation, to comply with standards that "the Secretary determines are necessary to protect the interests of the United States," 20 U.S.C. § 1087d(a)(7), and it has directed the Secretary to "prescribe such regulations as may be necessary" for "the establishment of reasonable standards of financial responsibility," including "any matter the Secretary deems necessary to the sound administration of the financial aid programs," *id.* § 1094(c)(1)(B).

Only one interpretation of the gainful-employment requirement makes sense in that context. If plaintiffs were correct that the statute required nothing more than preparing students to obtain any paying job (or, alternatively, that the statute precluded any inquiry into graduates' employment outcomes altogether), the statutory requirement would do little, if anything, to protect federal taxpayers' money. Under the Rule's interpretation, by contrast, the requirement helps improve the chances that Title IV loans will be repaid by ensuring that for-profit schools and vocational

24

programs may only participate in the Title IV assistance programs if their graduates typically earn sufficient income to repay their loans. *Cf. Association of Priv. Sector Colls. & Univs. v. Duncan*, 640 F. App'x 5, 8 (D.C. Cir. 2016) (per curiam) (unpublished) ("It would be strange for Congress to loan out money to train students for jobs that were insufficiently remunerative to permit the students to repay their loans. And it would be a perverse system that, by design, wasted taxpayer money in order to impose crippling, credit-destroying debt on lower-income students and graduates.").

That conclusion is particularly evident given that Congress was specifically concerned with ensuring that federal assistance would be repaid when it originally expanded federal student-loan-assistance programs (which, at the time, consisted of federally provided insurance of student loans rather than direct loans) to include vocational and technical education programs "designed to fit individuals for useful employment in recognized occupations." *Association of Priv. Sector Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 138-39 (D.D.C. 2012) (quotation omitted). In enacting that statute, Congress "placed considerable weight" on testimony that it received addressing the question whether graduates at such programs could likely "repay [their loans] following training." *Id.* at 139 (quotation omitted); *see also* S. Rep. No. 89-758, at 3-12; H.R. Rep. No. 89-308, at 3-9, 11. That testimony made clear that the vast majority of vocational program graduates were finding employment and that graduates' "median weekly income" was high enough "to make the concept of" rapid repayment "a reasonable approach to take." S. Rep. No. 89-758, at 8. Congress

similarly heard testimony that "the students receiving loans will, in almost every case, be enabled to repay them out of the added income resulting from their better educational status." *Id.* at 11.

In short, Congress determined to extend eligibility for participation in federal student-assistance programs to vocational and technical schools only after it received assurances that in fact most graduates of those schools "would be able to repay the loans incurred to gain that training." *Duncan*, 870 F. Supp. 2d at 139-40. Given that history, it is natural to understand the gainful-employment requirement as focused on ensuring that program graduates are generally able to repay the assistance that they receive, such that taxpayers are not left to foot the bill. By contrast, it makes little sense to conclude that Congress wished to preclude the Secretary altogether from taking into account—in implementing the gainful-employment statutory requirement that applies to for-profit and vocational programs—the very issues that so concerned Congress when it first extended eligibility to similar vocational and technical schools.

Finally, to the extent that any doubt remained about whether the Rule comports with the statute, Congress has recently resolved that doubt by effectively extending the Rule's principles to additional institutions. In July 2025—after the Rule was issued and after the district court refused to preliminarily enjoin the Rule, *see* ROA.5142—Congress amended the Higher Education Act to impose new median-earnings requirements that institutions offering undergraduate degrees, graduate or professional degrees, or graduate certificates must meet to be eligible to participate in

the Department's direct loans program. *See* Pub. L. No. 119-21, § 84001, 139 Stat. at 353 (2025). As plaintiffs observe (though without noting that this provision post-dates, rather than pre-dates, the Rule), those requirements are substantively "nearly identical to the earnings-premium test set forth" in the Rule. Br. 33.

The new statutory requirements do not apply to programs that do not lead to degrees or graduate certificates—such as the vocational programs offered by schools like plaintiffs, which lay in the heartland of the Rule. In enacting those requirements, though, Congress chose to leave the Rule in place. *Cf.* Pub. L. No. 119-21, §§ 85001-85002, 139 Stat. at 355-56 (providing, in the next two sections of the same statute, that two other Department of Education rules "shall not be in effect" for the next ten years). "Congress's engagement with" this specific subject through recent legislation "provides added assurance" of Congress's "approval of the" Rule's approach. *Jackson v. Modly*, 949 F.3d 763, 774 (D.C. Cir. 2020).

Moreover, to the extent that plaintiffs suggest (at 33-34) that Congress's recent enactment of a test similar to the Rule's approach but applying (in the main) to schools not covered by the Rule is evidence of the Rule's invalidity, that suggestion is unfounded. In plaintiffs' view, Congress's implicit exclusion of vocational programs like those offered by plaintiffs from the statutory requirements is evidence that Congress does not intend for vocational programs to be subject to similar earnings-based requirements. But plaintiffs offer no plausible reason to believe (much less any evidence showing) that Congress would have wanted to require programs offering

27

traditional undergraduate and graduate degrees—but not vocational certificate programs—to meet such earnings-based requirements as a condition of participation in direct loan programs. And such an outcome makes little sense; it is vocational programs like plaintiffs' whose raison d'être is to provide students with training that helps them secure profitable jobs and whose eligibility for Title IV participation turns on their ability to prepare students for gainful employment. In these circumstances, the far more natural inference from Congress's decision to impose similar requirements on other institutions—while leaving the Rule undisturbed—is that Congress endorsed the Rule's general framework and wished to extend it to additional institutions, not that Congress wished to undermine the Rule even as it left it in place.

### B. Plaintiffs' Additional Contrary Arguments Are Unpersuasive

Beyond plaintiffs' unpersuasive reading of the plain text, plaintiffs also advance a variety of arguments from context and history. None of those arguments could provide a compelling basis for departing from the best meaning of the statutory text. But in any event, each fails to persuade on its own merits.

1. Plaintiffs miss the mark in pointing to other provisions of the statute that they believe undercut the Department's understanding of "gainful employment." As an initial matter, plaintiffs read far too much into other statutory provisions addressing other aspects of the problem of unmanageable student loans.

For one, nothing about the Rule is inconsistent with the statutory "cohort default" provision, which specifies that an institution is generally ineligible for Title IV

funding if the default rate of its students is equal to or greater than 30%. 20 U.S.C. § 1085(a)(2), (m)(1); *see* Br. 34. That provision imposes a floor, not a ceiling, that applies to all institutions—not only the for-profit and vocational programs subject to the separate gainful-employment requirement—eligible for Title IV funding. And it focuses on institution-wide default rates, rather than on program-specific determinations about the extent to which a program's graduates typically obtain profitable employment. Nothing about that provision suggests an intent to restrict the Secretary from implementing the Rule's measures, which involve a different statutory provision, apply to a more limited set of programs, and operate on different metrics.

Even further afield are the provisions that plaintiffs cite (at 34-35) addressing when a borrower may qualify for debt relief and instructing the Department to survey borrowers about the effects of their debt. Those provisions operate with respect to individual borrowers, rather than with respect to institutional eligibility, and they do not discuss gainful employment at all. They thus provide no basis to support plaintiffs' interpretation of different statutory language in a different context. To the contrary, if anything, those provisions only underscore the need for the Rule: when borrowers who do not earn sufficient income receive individual debt relief, the burden of that relief falls on the taxpayer. It is only natural to conclude that Congress wanted to ensure that the Secretary has the ability to minimize the likelihood of such outcomes by screening out on the front end programs whose typical graduates do not earn sufficient income to reliably repay their loans.

Nor do plaintiffs make any headway in pointing out (at 36, 38-39) that other statutory and regulatory provisions use the phrase "gainful employment" in contexts that plaintiffs assert reflect an assumption that most, or all, paid employment would qualify. Of course, the same words in different contexts may have different meanings. *Environmental Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) ("A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies."). And the other provisions that plaintiffs cite involve substantially different contexts. *See Duncan*, 640 F. App'x at 7 ("The phrase 'gainful employment' appears, however, in many federal statutes and means different things in different contexts.").

For example, Congress prohibited recipients of certain fellowships from being "engaged in gainful employment," with certain exceptions. 20 U.S.C. § 1036(e)(1)(B)(ii) (cited at Br. 36). Even assuming that the term "gainful employment" in that provision means any paying job, Congress in that context might have been concerned that fellowship recipients who are currently enrolled in school would be distracted from their studies if they had any outside paying jobs and might have wanted fellowship recipients to focus exclusively on their school work. Moreover, because fellowship recipients are not expected to pay that money back, Congress would not have had any reason to be concerned with how much the job pays. By contrast, in the context of for-profit and vocational programs that must prepare students to obtain gainful employment after graduation, Congress was

30

animated by different concerns, including that graduates generally obtain employment sufficient to pay back their loans and avoid the burden on taxpayers that would otherwise result.

Those context-driven differences make particular sense given the ordinary meaning of "gainful" as "profitable" or "lucrative." *See supra* pp. 20-21. Whether particular employment is profitable depends on the circumstances. A college student who is primarily focused on her studies might well find part-time work a profitable way to earn additional income, whereas a vocational program graduate who has invested tens of thousands of dollars (or more) in her vocational education would likely consider that same part-time work an unprofitable outcome in context.

Indeed, plaintiffs only underscore the point when they note (at 39-40) that, in 1971, Congress added language in one statutory provision to bring volunteer firefighters into the ambit of "gainful employment." That congressional choice only underscores that Congress did not regard all employment, regardless of whether or how much the employment paid, as "gainful employment"—but that Congress was willing to treat volunteer work with a clear social benefit as worthy of federal investment. That singular exception does not suggest that Congress intended to similarly subsidize all vocational training programs regardless of graduates' ability to repay the investment in their education.

2. Plaintiffs fare no better in contending (at 32-33) that the Department's interpretation of "gainful employment" would "ascribe different meanings to" that

language depending on whether sufficient data exists to apply the Rule's provisions to a particular program. The Department understands the gainful-employment requirement to have a single meaning: it requires that the typical graduates of a for-profit or vocational program subject to the requirement obtain employment that is profitable in context, which is employment that provides sufficient income to enable the graduate to repay his loans and justify his (and the government's) investment in his education. Nonetheless, the Department has determined that it will not enforce the Rule's implementation of the requirement against certain programs—including new programs and programs in particular locations—because insufficient data exists to allow the Department to reasonably determine whether those programs meet the requirement. *See* 88 Fed. Reg. at 70192. That non-enforcement determination for lack of data does not reflect any "different meaning" that the Department is ascribing to the statute across the different contexts; it simply reflects a practical limitation on the Department's ability to enforce the statutory requirement in all circumstances.

Indeed, Congress has itself recognized a similar problem in the cohort default provisions discussed above. There, Congress determined that the provisions should apply only where "30 or more current and former students" at a particular institution "enter repayment on loans" in a given fiscal year. 20 U.S.C. § 1085(m)(1)(A). In thereby applying the cohort default requirement to some, but not other, institutions, Congress has not ascribed different meanings to that requirement in those different contexts. Nor does the Rule.

3. Plaintiffs are also incorrect to argue (at 36-38) that the Department's understanding of the gainful-employment requirement is undercut by the Department's determination not to impose earnings-related tests based on that language previously. Plaintiffs do not cite any contemporaneous Department regulations that interpreted the statutory language to preclude the adoption of earnings-based or debt-based metrics like those reflected in the Rule. Instead, plaintiffs' primary argument is simply that, following the enactment of the statute, the Department did not implement regulations that look similar to the metrics contained in the Rule.

But the statute confers substantial discretion on the Secretary to determine how best to enforce the various statutory provisions to further the goals of the statute and safeguard the public fisc. *See supra* pp. 5-6, 23-24. If there was no particular reason for concern, in the first decades after the statute was enacted, that for-profit or vocational programs were failing to adequately prepare their students to obtain sufficiently remunerative employment, the Secretary might have reasonably considered it to not be an appropriate exercise of his discretionary enforcement authority to establish and implement regulatory requirements addressing a problem that did not exist. But recent changes in "graduates' earnings, student loan debt, defaults, and repayment" have indicated that these programs are not complying with their statutory obligation. 76 Fed. Reg. 34386, 34497 (June 13, 2011). Indeed, when the Department first moved in the direction (15 years ago) of implementing similar earnings-based metrics, it

33

expressly relied on these changing "trends" to explain "the need for the Department to act." *Id.*; *see also* 88 Fed. Reg. at 70014 ("The need for such rules became clearer over time.").

Regardless, in arguing that the absence of similar regulations in the past should undercut the Rule now, plaintiffs rely almost entirely (at 38) on the Supreme Court's cases developing and applying the Major Questions Doctrine. But that doctrine applies only to "extraordinary cases" where "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (alteration and quotation omitted). In those circumstances, courts are hesitant to "locate[]" some "newfound power in the vague language of an ancillary provision of" a statute. *Id.* at 724 (alteration and quotation omitted). By contrast, the principles of the Major Question Doctrine "ha[ve] no great effect" in "the ordinary case." *Id.* at 721. Here, plaintiffs nowhere contend (and could not reasonably contend) that the challenged aspects of the Rule—which do no more than implement reasonable earnings metrics that certain for-profit and vocational programs must satisfy to maintain eligibility for participation in Title IV assistance—are of such a magnitude or significance to implicate those principles. And in any event, there are multiple statutory indications that Congress intended for the Secretary to exercise her regulatory authority to ensure

34

the financial well-being of Title IV programs and avoid undue burdens on taxpayers. *See supra* pp. 5-6, 23-24.

## II.     The Rule Is Reasonable and Reasonably Explained

In addition to questioning the Department's statutory authority to take account of graduates' incomes in any way, plaintiffs also contend that various specific features of the Rule's framework are arbitrary and capricious. But the "highly deferential" arbitrary-and-capricious standard provides only for "narrow" review. *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009). To clear that bar, agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Rule more than meets that bar, and plaintiffs' contrary arguments are erroneous.

1. At the outset, plaintiffs argue (at 45-49) that the Rule unreasonably uses federal earnings data, which the Department intends to obtain from the IRS, to determine graduates' income, even though (in plaintiffs' view) cosmetology graduates are likely to severely (and unlawfully) under-report their incomes for tax purposes. But this specific issue was extensively considered by the Department, which ultimately determined that federal earnings data reflects the best available data, that under-reporting is not as prevalent as plaintiffs fear, and that any under-reporting would be ameliorated by various mitigation measures adopted by the Department. Those

determinations were reasonable and reasonably explained, as the district court correctly held. *See* ROA.4144-47.

As an initial matter, plaintiffs do not dispute that federal taxpayer data will generally be the highest quality and most reliable data available to the Department to measure graduates' earnings. Instead, plaintiffs contend only that such data may be unreliable "in cash- and tip-heavy fields—especially cosmetology"—where employees assertedly "do not actually report all earnings to the federal government." Br. 45-46 (quotation omitted). But in making that argument, plaintiffs necessarily "face[] an uphill battle," because "in formulating general rules, a regulator need not always carve out exceptions for arguably distinct subcategories" of regulated entities. *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 135 (D.C. Cir. 2022) (quotation omitted).

Here, the concerns that plaintiffs raise were specifically considered by the Department during the rulemaking, and the Department reasonably determined to use federal earnings data notwithstanding those concerns. In making that choice, the Department "fully explained its view that underreporting is likely not as widespread as Plaintiffs claim," "reasonably explained and responded to comments about" proposed alternatives, and "reviewed and responded to comments about the reported earnings." ROA.4144.

The Department catalogued multiple reasons why it concluded that it was most appropriate to use federal earnings data. For one, "individuals are legally required to report their" taxable income and are "subject to considerable legal penalties" for any

failure to do so. 88 Fed. Reg. at 70041. For another, the Department relies extensively on the same "reported income" data in "its administration of the title IV" programs, including for determining "Pell grant eligibility, subsidized loan eligibility, and income-driven repayment payment determinations." *Id.* The Department concluded that it "would be inconsistent and imprudent" to "use different earnings data for similar purposes" in administering the same Title IV programs. *Id.* And the Department determined to "avoid the perverse incentives that would be created by making the rule's application more lenient for programs in proportion to how commonly their graduates unlawfully underreport their incomes," explaining that it would be inappropriate for "taxpayer-supported educational programs" to, "in effect, receive credit when their graduates fail to report income for tax purposes." *Id.* at 70042.

In addition, the Department reasonably determined that under-reporting of tips in the cosmetology sector specifically was not likely to be as prevalent as plaintiffs assert. The Department relied on a 2022 study, which found that "earnings underreporting" in that context "is likely to be small—about 8 percent"—and which specifically critiqued an earlier study finding more prevalent under-reporting. 88 Fed. Reg. at 70042. The Department "independently reviewed" both studies, as well as other evidence, and determined that the earlier study "appears to include an unrealistic overestimate of underreported total income." *Id.* at 70042 n.139.

The Department also explained that the nature of the "increasingly digitized economy" reduced concerns about "tax evasion as a source of error" in the

Department's measurements. 88 Fed. Reg. at 70041. When employees receive tips through "digital transactions" (such as credit card payments or payment apps like Venmo and PayPal), "records of the transactions are kept" by both "business owners" and "payment processers," and these records "expose[] would-be evaders to elevated risk of apprehension in the case of an audit." *Id.* As a result, "there are now greater practical hurdles to evading Federal tax reporting" than there were previously. *Id.*

Moreover, "despite finding a lack of underreporting," the Department nonetheless incorporated into the rule various "ways that the new metrics were designed to include safeguards against underestimates of earnings." ROA.4145 (quotation omitted). For one, compared to a previous regulation, this Rule "will measure the earnings of program completers approximately one year later (relative to when they complete their credential)." 88 Fed. Reg. at 70096. Based on the Department's analysis, it determined that the increases in reported income from that additional year "are likely to be much higher than the 8 percent estimate of underreporting." *Id.* at 70042. Specifically, for "the programs most at risk for failing the earnings premium threshold," that additional year will result in "substantially higher measured program earnings"—"on the order of $4,000 (about 20 percent)." *Id.* at 70096. Thus, even if a program's graduates continue to under-report their earnings, the additional earnings generated by moving the measurement window back a year will more than make up for the under-reported income. Moreover, the fact that a program must fail a metric in multiple years to be deemed ineligible for Title IV

funding further reduces the risk that a program will be erroneously excluded from funding. *See id.* at 70095.

Plaintiffs mistakenly argue (at 46) that the use of IRS data is unreasonable because that data contains "statistical noise." The Department "thoroughly considered the issue of statistical noise in IRS earnings data" and determined that the "small amount of statistical noise" that the IRS would add to its estimates was minimally relevant. 88 Fed. Reg. at 70095-96. Based on its analysis of the data, the Department determined that "the probability that a program could be erroneously declared ineligible" as a result of the added noise was "less than 1 percent." *Id.* at 70096. And the Department explained that it "plans to counteract this already small risk of improper classification in several ways," including by adopting a minimum-size threshold for subjecting programs to the Rule (because "statistical noise would have a greater impact" on "smaller cohorts"), ensuring that a program will not be ineligible until it "fails the accountability measures multiple times," and adopting an earnings calculation methodology that "is more generous" to programs than previous methodologies had been. *Id.* Indeed, the effect of that more generous methodology alone "will provide a buffer more than sufficient to counter possible error introduced by statistical noise added by the IRS." *Id.* In light of all of those factors together, the Department concluded that it was appropriate to use IRS data notwithstanding the statistical noise.

Plaintiffs make no more headway in contending (at 46, 48-49) that the Department unreasonably declined to establish a process whereby programs could challenge the Department's data or provide their own. The Department specifically considered whether to permit programs to challenge the Department's conclusions through an appeal process where they could "offer alternative measures of earnings," such as data collected through surveys. 88 Fed. Reg. at 70041. The Department determined that it was "neither necessary nor appropriate" to offer that opportunity. *Id.* at 70095.

That determination was more than reasonable. *See* ROA.4146-47. The Department explained that its previous experience showed that such a process "contained serious flaws and failed to yield adequately reliable earnings data." 88 Fed. Reg. at 70096. Specifically, the appeals process permitted under previous rules resulted in "implausibly high earnings reported through the survey measures," likely caused by some combination of inaccurate recall "and selection bias (*i.e.*, only higher earners were sampled, or they were differentially likely to respond)." *Id.* at 70041; *see also id.* at 70096 ("There are inherent biases for survey respondents to inflate their earnings and little incentive for institutions to encourage accurate survey responses."). Moreover, for a variety of reasons, problems with inaccurate measurements "would be more likely to occur in survey measurements of income than in administrative records." *Id.* at 70041-42. And establishing such a process "would impose significant administrative burden on institutions" and on "the Department." *Id.* at 70095.

2. Plaintiffs are also wrong to assert (at 49-52) that the Rule unreasonably "punish[es] schools for factors outside their control," Br. 49, such as their graduates' choices about whether to enter the workforce, the potential effect of their graduates' demographics on their wages, and the possibility of macroeconomic events that might depress wages.

As an initial matter, plaintiffs' arguments on this score fundamentally misunderstand the Rule, which is not aimed at "punishing" schools who fail the metrics (or, conversely, at rewarding schools that pass). Instead, the point of the Rule is—as explained—to ensure that taxpayer funds are being spent responsibly on loans that students will likely be able to repay and to fund vocational training that will likely increase graduates' earning potential. *See* 88 Fed. Reg. at 70086 (emphasizing that the Rule "is designed to protect both Federal investment and student investment in programs of higher education," not provide an "entitlement[]" to schools).

Plaintiffs nowhere contest that the Rule's metrics are reasonably related to that goal. Nor could they. The Rule's analysis shows that "students who attend programs that fall below the debt-to-earnings standard are consistently projected to repay less on their loans, in present value terms, than they borrowed." 88 Fed. Reg. at 70117. And the problem is even worse for programs that fail the earnings-premium metric. *See id.* Indeed, the graduates of for-profit programs that fail that metric are expected to repay only 8% of the taxpayer funds that they borrow. *See id.* at 70118. Thus, the Department reasonably concluded that the Rule's metrics were properly calibrated to

advance the Rule's (and statute's) purpose of safeguarding taxpayer funds. And that conclusion holds regardless of the reasons that any particular graduate fails to earn sufficient income to repay her loans or justify her investment.

Regardless, even on their own terms, plaintiffs' complaints are unavailing. For one, although plaintiffs may not be able to control their graduates' choices or macroeconomic conditions, plaintiffs are able to control their business model. The Rule reflects that many cosmetology programs choose not to participate in Title IV at all. *See* 88 Fed. Reg. at 70086 (citing evidence that about two-thirds of cosmetology schools in California, and 86% in Texas, do not participate in Title IV). The evidence reflects that such schools generally charge significantly lower tuition than programs that participate in Title IV and still produce graduates that "pass licensure exams at similar rates." *Id.*; *see also* ROA.2104 n.26.

Plaintiffs, by contrast, have chosen to participate in Title IV. That choice may allow plaintiffs to charge higher tuition, as students are able to finance their education with federal assistance. But that choice also comes with the risk—borne by students and by taxpayers—that their graduates will not typically earn sufficient income to repay the loans necessary to finance that higher tuition. And in light of that risk, Congress has determined that plaintiffs must satisfy the statute's gainful-employment requirement. That requirement stems from their own choice to participate, and it is plainly reasonable to require that they meet the Rule's requirements as a condition of

that participation, regardless of their ability to control each graduate's choices or macroeconomic conditions. Programs have no entitlement to Title IV funds.

In any event, the Department reasonably concluded that the outlier outcomes or catastrophic macroeconomic events that plaintiffs assert as concerns did not undermine the reasonableness of the Rule. With respect to plaintiffs' concerns about their graduates' choices and demographics, the Rule's metrics assess only the median debt and earnings of each graduate cohort, *see* 88 Fed. Reg. at 70189-90, thereby reducing the effect on a program's outcomes from some graduates' potential decisions to leave the workforce or accept lower-paying (or part-time) employment. Thus, for example, the earnings-premium metric "does not demand that every individual who attends" a covered program "must earn more than a high school graduate; instead, the measure requires only that at least half of those who actually complete the program are earning at least slightly more than individuals who had never completed postsecondary education." *Id.* at 70015.

Moreover, the Department specifically considered the extent to which student demographics may influence a program's results under the Rule's metrics and determined that no demographic adjustments were warranted. As the district court recognized, in conducting that analysis, the "Department used a range of research-informed statistical and non-statistical factors, which it described in detail." ROA.4151. "Based on the totality of its data analyses, the Department concluded that 'programs and institutions play an important causal role in determining student

43

outcomes, more so than student demographics'" do, and "that 'programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone.'" ROA.4151 (quoting ROA.2117 (quoting 88 Fed. Reg. at 70031, 70140)). The Department thus determined that "the demographic makeup of a program's students" does not "sufficiently influence[] whether the program meets this final rule's minimal thresholds for financial value such that the Department should alter or abandon the regulations." 88 Fed. Reg. at 70031.

Nor do plaintiffs' speculative concerns about future "unpredictable" "outlier events" like "the Great Recession," Br. 50 (quotation omitted), provide any basis for invalidating the Rule. The Department specifically considered whether the possibility of future "rapid downturns in the economy" should lead it to alter the Rule's framework and determined that no alterations were warranted. 88 Fed. Reg. at 70057. As the Department explained, one benefit of postsecondary education "is some degree of insulation from economic downturns, and an important measure of program quality is the robustness of its graduates' employment outcomes to economic shocks." *Id.* at 70058. Moreover, the Department explained that any economic downturn would likely affect the earnings of high school graduates even more than postsecondary program graduates. Thus, at least the earnings-premium metric, which is calculated by reference to high school graduates' earnings, has a built-in "buffer[]" against the effects of economic downturns. *Id.*; *see also* ROA.4149.

44

In any event, plaintiffs do not explain how the possibility that the Rule's framework might be unreasonable to apply in the case of some future, hypothetical "outlier" macroeconomic event could justify invaliding the Rule on its face. *Cf. Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016) (explaining that a party bringing a facial challenge to a regulation "must establish that no set of circumstances exists under which the Rule would be valid" (alteration and quotation omitted)). Of course, the Department is not able to predict every possible future outlier event or develop a regulation tailored to the specific effect that each such speculative event might have on every type of for-profit and vocational program. But if any such event were to happen, the Department would determine how best to implement the Rule's framework in the context of that specific event, including whether the Rule should be modified or the circumstances might warrant exercising the Secretary's enforcement discretion. *Cf.* ROA.4149 (noting that the Rule observed that the Secretary may exercise statutory authority "to waive or modify regulatory provisions in the future if needed to respond to exceptional circumstances"). Nothing about those "hypothetical future events" provides any basis for "deem[ing]" the Rule "arbitrary" today. ROA.4149.

3. The Rule also reasonably explains the Department's choice to implement debt-to-earnings thresholds of 8% of total earnings and 20% of discretionary earnings, notwithstanding plaintiffs' complaints (at 53-55) to the contrary. As the district court explained, under these thresholds, "[i]f the median debt of the program's

45

student cohort three years after graduation exceeds 8% of the cohort's median annual earnings and exceeds 20% of its median discretionary income (income above 150% of the federal Poverty Guideline), the program fails the debt-to-earnings metric for the year." ROA.4147. The Department determined to implement both thresholds (and to permit a program to pass the metric if either is satisfied) "because if a student makes higher earnings (above 150% of the federal Poverty Guideline) then paying more in loans would be more manageable." ROA.4147.

The 8% and 20% thresholds reflect the Department's determination about "how much debt service payments are affordable based on an individual's earnings." 88 Fed. Reg. at 70020. And that determination was reasonably supported by the record. In setting those thresholds, the Department primarily drew on the work of "economists Sandy Baum and Saul Schwartz." 88 Fed. Reg. 32300, 32326 (May 19, 2023). As the Department explained, that work reflects that the "acceptable threshold of 8 percent" of total income "has been a reasonably common mortgage-underwriting standard, as many lenders typically recommend that all non-mortgage loan installments not exceed 8 percent of the borrower's pretaxed income." *Id.* Based on those recommendations, other "[s]tudies of student debt have accepted the 8 percent standard and some State agencies have established guidelines based on this limit." *Id.*

Similarly, the Department drew the 20% discretionary threshold from the same economists' work, explaining that "the authors' research suggested that no student should have loan payments exceeding 20 percent of their discretionary income" and

that, in subsequent work, one of the economists concluded that, "if anything, a 20 percent discretionary threshold for the median borrower is too permissive and a stricter standard would be justified." 88 Fed. Reg. at 70053; *see also* 88 Fed. Reg. at 32326 (explaining that the "acceptable threshold for the discretionary income rate would be set at 20 percent, based on research conducted by economists Sandy Baum and Saul Schwartz," who "concluded that there are virtually no circumstances under which higher debt-service ratios would be reasonable").

In response, plaintiffs contend (at 53-55) that the economists' work does not translate perfectly to the context of the Rule and that the work acknowledges that the precise thresholds are ultimately arbitrary. But the Department expressly acknowledged that different context, explaining that "the starting point for [that] research was in the context of the affordability of mortgage rates." 88 Fed. Reg. at 70053. Nonetheless, the Department ultimately determined that the "overall point stands—that it would not be affordable for borrowers to have student debt-service ratios beyond" the thresholds specified in the Rule. *Id.* And the Department further explained that other researchers and State agencies had similarly determined to apply the economists' thresholds in the context of student debt. *See* 88 Fed. Reg. at 32326. Thus, rather than simply adopting the economists' work uncritically, the Department used that work as a starting point and then, applying its own judgment and expertise, determined that it was appropriate to adopt the thresholds identified in that work for the Rule's framework. That explanation more than satisfied the APA's standards.

Nor are plaintiffs correct when they assert (at 54-55) that the Rule's use of the academic work unreasonably departs from the Department's determination in a 2019 regulation that the work did not support the 8% threshold. The 2019 regulation acknowledged that the economists' earlier work, standing alone, does not provide categorical support for at least the 8% threshold. *See* 84 Fed. Reg. 31392, 31426 (July 1, 2019). But as explained, the Rule does not simply uncritically adopt the 8% threshold from the single academic work. Although the Rule uses that work as a starting point, the Rule explains that other academic work and State regulations also supported the use of an 8% threshold and, ultimately, the Rule reflects the Department's own independent determination that such a threshold reasonably reflects the amount of debt that a student will likely be able to repay. 88 Fed. Reg. at 32326; 88 Fed. Reg. at 70053.

Regardless, the Rule's engagement with the earlier academic work itself reflects the Department's determination that, contrary to the Department's 2019 conclusion, the academic work on its face does in fact provide direct support for the 8% threshold, even if the work starts with information from a different context. Indeed, as the 2019 regulation expressly acknowledged, one of the economists in question has since made clear that he believes his work would support even stricter thresholds than those adopted in the Rule—and certainly does not "refute[]" the use of those thresholds. 84 Fed. Reg. at 31426. Particularly in the context of the Department's own

assessment of the support for the 8% threshold, it was reasonable for the Department to give weight to the economist's understanding of the implications of his own work.

Finally, the Department also included additional safeguards to ameliorate any possibility that the Rule's thresholds would be too harsh individually. For one, as explained, because the Rule uses median debt and earnings data, a program may pass the debt-to-earnings metric even if only half of its graduates are earning sufficient income to meet the Rule's thresholds. And beyond that, the Rule combines the two thresholds, such that a program's graduates must fail both measures for the program to fail the metric. As the district court explained, the record reflects evidence that, "when combined," the thresholds, "if anything, are too generous to gainful employment programs." ROA.4148; *see also* 88 Fed. Reg. 70174 (explaining that the Department's adoption of both thresholds is "more generous to institutions"). Thus, the Department "reasonably concluded" that the thresholds, "when applied together," are "more than reasonable for the debt to earnings metric." ROA.4148.

4. Finally, plaintiffs are incorrect in arguing (at 56-57) that the Rule's cost-benefit analysis is illogical. As required by internal Executive Branch guidance, the Department examined the "potential costs and benefits (quantitative and qualitative)" of the Rule and "determined that the benefits" will "justify the costs." 88 Fed. Reg. at 70100. As the district court correctly held, the Department's conclusion on this score was more than reasonable. ROA.4149-50; *see also Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (explaining that "the agency's reasons and

policy choices" regarding "the costs and benefits associated with" a regulation must only "satisfy minimum standards of rationality" (quotation omitted)).

As to the benefits of the Rule, the Department estimated—in analysis that plaintiffs do not dispute—that the Rule would ultimately save nearly $14 billion in federal funds. 88 Fed. Reg. at 70163; *see also* ROA.4150 (relying on this estimate). And the Department further estimated that the Rule would have significant benefits for students. As the Department explained, when a "student takes on debt that exceeds their capacity to repay," that "can cause substantial harm" to the student. 88 Fed. Reg. at 70116. In addition to the obvious financial harm that such debt can cause, research also indicates that students overburdened by debt may "delay certain milestones," such as marriage; are "less likely to obtain a graduate degree"; and are "less likely to take out a mortgage to purchase a home." *Id.* at 70116-17. The Rule will thus benefit students by helping to ensure that they are not attending for-profit and vocational programs that leave them saddled with unmanageable debt or that otherwise reflect a poor financial investment.

Conversely, although plaintiffs claim (at 56-57) that the Rule will have substantial costs for students because a large number of Title IV cosmetology programs are projected to fail the Rule's metrics and may, in plaintiffs' view, be forced to close, the Rule specifically addressed this possibility and determined that it was not correct (much less sufficiently weighty to overcome the billions of dollars in benefits that the Rule will generate). As the Rule explains, many cosmetology programs do not

50

participate in Title IV at all, including approximately two-thirds of programs in California and 86% in Texas. 88 Fed. Reg. at 70086. And when cosmetology programs specifically lose Title IV eligibility, the result tends to be that "schools adjust[] their tuition downward" and yet "their graduates still pass licensure exams at similar rates." *Id.* Thus, the Department rejected assertions that programs that fail the Rule's metrics will necessarily close and thereby reduce opportunity for students. *Id.* And regardless, as the Department explained, the point of the Rule's metrics is "to protect both Federal investment and student investment." *Id.* And it is not a benefit—to either students or the public—for students to have the opportunity to use taxpayer funds to attend vocational programs that saddle them with unmanageable debt that they cannot repay.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

THOMAS PULHAM

*s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

May 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,377 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

_s/ Sean R. Janda_
Sean R. Janda