# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS; OGLE SCHOOL MANAGEMENT, L.L.C.; TRICOCI UNIVERSITY OF BEAUTY CULTURE, L.L.C.; DUVALL'S SCHOOL OF COSMETOLOGY, L.L.C.,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, Secretary, U.S. Department of Education, in her official capacity,

*Defendants-Appellees*.

(*caption continued on inside cover*)

On Appeal from the United States District Court
for the Northern District of Texas,
Nos. 4:23-CV-1267, 4:24-CV-259

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC; AND AMERICAN ASSOCIATION OF COSMETOLOGY SCHOOLS

PAUL D. CLEMENT
 *Counsel of Record*
ANDREW C. LAWRENCE
KEVIN WYNOSKY
CHADWICK J. HARPER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals who are members of the Virginia bar

*Counsel for Plaintiffs-Appellants Ogle School Management LLC; Tricoci University of Beauty Culture, LLC; and American Association of Cosmetology Schools*

June 17, 2026

_____

OGLE SCHOOL MANAGEMENT, L.L.C.; TRICOCI UNIVERSITY OF
BEAUTY CULTURE, L.L.C.,

*Plaintiffs-Appellants*

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, Secretary, U.S.
Department of Education, in her official capacity,

*Defendants-Appellees*.

_____

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... ii

INTRODUCTION ................................................................................................... 1

I.    The Department's Interpretation Of The HEA's "Gainful Employment" Language Is Inconsistent With The Statute............................. 2

II.    The Department's Action Is Arbitrary And Capricious ................................ 14

    A.    The Department Illogically Relies on Concededly Inaccurate Earnings Data ..................................................................... 15

    B.    The Department's Earnings-Based Tests Illogically Penalize Schools for Factors Beyond Their Control ........................................ 20

    C.    The Department Relies on Illogical Debt-to-Earnings Thresholds ................................................................................. 23

    D.    The Department's Cost-Benefit Analysis Is Illogical ........................ 26

CONCLUSION ..................................................................................................... 28

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023)........................................................................9

*Airlines for Am. v. DOT*,
110 F.4th 672 (5th Cir. 2024).......................................................................8

*Am. Ass'n of Cosmetology Schs. v. Devos*,
258 F.Supp.3d 50 (D.D.C. 2017) ......................................................... 16, 17

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019)....................................................................................12

*Career Colls. & Schs. of Tex. v. DOE*,
98 F.4th 220 (5th Cir. 2024).......................................................................28

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023)......................................... 22, 25, 26, 28

*Data Mktg. P'ship, LP v. DOL*,
45 F.4th 846 (5th Cir. 2022).......................................................................15

*Dep't of Homeland Sec. v. MacLean*,
574 U.S. 383 (2015)....................................................................................11

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................................................................................25

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
45 F.4th 127 (D.C. Cir. 2022) ...................................................................16

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019)....................................................................................12

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
2026 WL 1686059 (U.S. June 11, 2026) ...................................................11

*FTC v. Bunte Bros.*,
312 U.S. 349 (1941)....................................................................................13

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
  968 F.3d 454 (5th Cir. 2020)................................................................7, 8

*Jama v. ICE*,
  543 U.S. 335 (2005)...........................................................................10

*Lomax v. Ortiz-Marquez*,
  140 S.Ct. 1721 (2020).......................................................................11

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)............................................................... 1, 2, 4, 13

*Nat'l Ass'n of Mfrs. v. DOD*,
  583 U.S. 109 (2018).............................................................................6

*Ohio v. EPA*,
  603 U.S. 279 (2024)...........................................................................17

*Printz v. United States*,
  521 U.S. 898 (1997)...........................................................................14

*Rest. L. Ctr. v. DOL*,
  120 F.4th 163 (5th Cir. 2024)..............................................................9

*Samantar v. Yousuf*,
  560 U.S. 305 (2010)...........................................................................10

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)...........................................................................13

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019)..............................................................19

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021)..............................................................17

**Statutes**

5 U.S.C. §706(2)(A)................................................................................21

20 U.S.C. §1002(a) ......................................................................... 3, 6, 7

20 U.S.C. §1002(b)(1)..................................................................... 3, 6, 8

20 U.S.C. §1002(c)(1) ...................................................................................8

20 U.S.C. §1015a(k)(D) ...............................................................................10

20 U.S.C. §1036(e)(1) .................................................................................11

20 U.S.C. §1085(a)(2) .................................................................................10

20 U.S.C. §1085(m)(1) ................................................................................10

20 U.S.C. §1085(*o*)(2) ...............................................................................10

20 U.S.C. §1087d .................................................................................. 9, 10

20 U.S.C. §1087d(a)(7) .................................................................................7

20 U.S.C. §1087d(c)(5) ...............................................................................20

20 U.S.C. §1087dd(e)(1) ..............................................................................10

20 U.S.C. §1088(b)(1) .......................................................................... 3, 6, 7

20 U.S.C. §1094(c)(1) .................................................................................. 7

20 U.S.C. §1098bb(a)(2) ..............................................................................23

20 U.S.C. §1098e(b)(7) ...............................................................................10

20 U.S.C. §1098ee(4) ..................................................................................23

20 U.S.C. §1134c(a) ...................................................................................11

20 U.S.C. §1135c(d)(2) ...............................................................................11

20 U.S.C. §1161g(d)(5) ...............................................................................11

Pub. L. No. 92-318, §202(b), 86 Stat. 235 (1972) ...........................................5

**Regulations**

34 C.F.R. §668.8(c) ....................................................................................14

34 C.F.R. §668.8(g)(1) ................................................................................14

76 Fed. Reg. 34,386 (June 13, 2011) ...................................................... 1, 15

79 Fed. Reg. 16,426 (Mar. 25, 2014)...............................................................24

79 Fed. Reg. 64,890 (Oct. 31, 2014)......................................................... 1, 15

84 Fed. Reg. 31,392 (July 1, 2019)................................................... *passim*

88 Fed. Reg. 70,004 (Oct. 10, 2023)................................................ *passim*

91 Fed. Reg. 21,088 (Apr. 20, 2026) ............................................... 2, 24

**Other Authorities**

*Black's Law Dictionary* (4th ed. rev. 1968)...................................................5

*Black's Law Dictionary* (12th ed. 2024) ......................................................4

H.R. Rep. No. 89-308 ...................................................................................13

*In re Acad. For Jewish Educ.*, 1994 WL 1026087
  (Dep't of Educ. Mar. 23, 1994).............................................................14

IRS, *IRS issues FAQs on Form 1099-K threshold under the One, Big,
  Beautiful Bill; dollar limit reverts to $20,000* (Oct. 23, 2025)...........17

S. Rep. No. 89-758.......................................................................................12

S. Rep. No. 92-346 (1971) .............................................................................5

The Random House Dictionary of the English Language
  (2d ed. unabridged, 1987).......................................................................5

Joseph E. Worcester, *A Dictionary of the English Language* (1860) ....... 5

## INTRODUCTION

In 2019, during the first Trump Administration, the Department of Education (Department) admitted that it "had incorrectly described congressional intent and engaged in regulatory overreach" when it promulgated "fundamentally flawed" and "absurd" gainful-employment regulations in 2011 and 2014 that had departed from decades of regulatory practice and widespread understanding. 84 Fed. Reg. 31,392, 31,392, 31,402, 31,410 (July 1, 2019) (2019 Rule); *see* 76 Fed. Reg. 34,386 (June 13, 2011) (2011 Rule); 79 Fed. Reg. 64,890 (Oct. 31, 2014) (2014 Rule). Now, during the second Trump Administration, the Department is inexplicably embracing a gainful-employment rule issued by the Biden Administration in 2023, *see* 88 Fed. Reg. 70,004 (Oct. 10, 2023) (2023 Rule), even though it contains all the same legal and logical problems the Department correctly identified in 2019—and then some.

The Department got it right in 2019, and its latest U-turn is indefensible. In reality, the 2023 Rule is fundamentally divorced from the operative "gainful employment" language in the Higher Education Act (HEA), which is why the Department can defend the 2023 Rule only by rewriting the statutory text and pretending that the Supreme Court never decided *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). And while that statutory defect alone dooms the 2023 Rule, it is also a four-time offender of the Administrative Procedure Act's (APA) arbitrary-and-capricious standard—for many of the same reasons that the

Department itself highlighted in 2019. In fact, just weeks ago, the Department itself reiterated that the debt-to-earnings test in the 2023 Rule is fatally "flawed." 91 Fed. Reg. 21,088, 21,104-05 (Apr. 20, 2026). Yet the Department defends that test and the rest of the Biden Administration's handiwork in this appeal. That kind of inconsistency is not an administrative-law virtue, and Plaintiffs are bearing the real-world costs of the Department's internal contradictions. The Court should vacate the 2023 Rule before cosmetology schools and in-demand educational programs that provide women and minorities with flexible and AI-proof employment are shuttered.

## I. The Department's Interpretation Of The HEA's "Gainful Employment" Language Is Inconsistent With The Statute.

As the Supreme Court explained in *Loper Bright*, when interpreting statutes, the objective is to find and apply the "best reading" of the statute after utilizing "every tool" in the "interpretive toolkit." 603 U.S. at 400, 409. The Department does not dispute that the district court came nowhere close to using its full interpretative toolkit when sustaining the Department's interpretation of the gainful-employment language in the 2023 Rule. But although the Department never even mentions *Loper Bright*—and instead seeks refuge in *Chevron*-dependent cases addressing the 2011 and 2014 Rules, *see* Resp.Br.24, 26, 30—it posits that "statutory text, context, and history" confirm that the 2023 Rule "[c]omports with" the HEA's gainful-employment language. Resp.Br.19-20. The Department is wrong on all counts.

2

1.     The 2023 Rule is impossible to square with the operative text of the HEA.  That language provides that a for-profit school can qualify as "eligible" to process Title-IV aid if it "provides an eligible program of training to prepare students for gainful employment in a recognized occupation."   20 U.S.C. §§1002(a), (b)(1)(A)(i); *see id.* §1088(b)(1)(A)(i).   As Plaintiffs have explained, *see* Opening.Br.28-44, that language has a straightforward meaning.  To qualify as Title-IV eligible, for-profit schools must provide instruction designed to get current enrollees ready for a paying job in an acknowledged vocational field like cosmetology.  In other words, unlike public or non-profit schools, for-profit schools typically cannot qualify as Title-IV eligible by providing general instruction in the liberal arts or humanities.  But that is all "gainful employment" means.  Although the Department previously embraced that same interpretation, *see* 84 Fed. Reg. at 31,401, it now reverses course, claiming that the statutory text "confers substantial discretion" on the agency to "focus[]" on whether the "typical program graduate" "actually obtain[s]" "sufficiently lucrative" or "sufficiently remunerative" employment to "repay his loans" and to outearn a "typical high school graduate without postsecondary education or training."  Resp.Br.2, 20, 33.  That convoluted reading is a poster child for the kind of implied delegation that *Loper Bright* forecloses and is flawed on multiple levels.

3

The first and most basic problem with the Department's theory is that it simply misinterprets the critical phrase "gainful employment." Contrary to the Department's understanding, that is not "a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395 (citation omitted). Rather, it is a binary term that—since at least the 17th century—has meant "[w]ork that a person can pursue and perform for money." *Employment*, *Black's Law Dictionary* (12th ed. 2024). The definition thus is well-designed to distinguish cosmetology or culinary training from philosophy, but whether the job enabled by the practical training pays a lot or a little or exceeds certain expenses is not part of the definition.

The Department protests that this centuries-old understanding (and the position that the Department itself embraced in 2019) renders the term gainful "impermissibly superfluous." Resp.Br.22. Under this line of reasoning, "gainful employment" cannot mean just a paying job because the term "employment"—"standing alone"—"of course" encompasses "paid work" already. Resp.Br.22. The Department did not press this argument in its summary-judgment papers below, with good reason. The Department *itself* "recognize[d]" in the 2023 Rule that it is possible to "obtain employment that is unpaid." 88 Fed. Reg. at 70,067. That reflects the reality that the term "employment" can capture unpaid work—*viz.*, "an activity or the like that occupies a person's time." The Random House Dictionary

4

of the English Language 638 (2d ed. unabridged, 1987) (Random House); *see* Joseph E. Worcester, *A Dictionary of the English Language* 478 (1860) ("employment" includes "avocation"). The term "gainful" thus does important, non-superfluous work by making clear that for-profit schools can qualify as Title-IV eligible only if they provide training programs designed to prepare students for *paid* jobs in recognized occupations. That understanding of "gainful employment" is the reason why Congress recognized in the 1970s that "volunteer firemen"—*i.e.*, firemen employed "without compensation"—are not included within the ordinary meaning of "gainfully employed" and would need a special statutory exception to fall within the ambit of the term.[1]  S. Rep. No. 92-346, at 75 (1971); *see* Pub. L. No. 92-318, §202(b), 86 Stat. 235, 325 (1972).

The Department emphasizes that "gainful" is synonymous with words like "profitable" and "lucrative." Resp.Br.21. Plaintiffs have never suggested otherwise. That is because—as the Department's cited dictionaries confirm—those words just mean "bearing or yielding a revenue or salary." *See Black's Law Dictionary* 1098 (4th ed. rev. 1968) (defining "lucrative" as "[y]ielding gain or profit; profitable;

---

[1] The Department suggests that the volunteer-firemen exception demonstrates that Congress treats volunteer work as gainful employment only when it has a "clear social benefit." Resp.Br.31. The Department provides no support for its clear-social-benefit theory. Instead, the reason for the exception was the obvious one: Volunteer firemen "serve[d] on a volunteer basis, without compensation." S. Rep. No. 92-346, at 75 (1971).

bearing or yielding a revenue or salary"). Indeed, the Department implicitly concedes that phrases like gainful employment and lucrative employment—standing alone—just mean paid employment by repeatedly resorting to phrases like "*sufficiently* lucrative employment" to justify a 2023 Rule that examines whether paying jobs pay enough to avoid certain debt-to-earnings ratios and to outearn in-state high-school graduates. *See* Resp.Br.2, 11, 15-16, 20-21, 23, 25, 29, 31-33, 42. While the phrase "sufficiently gainful employment" perhaps leaves room for the Department to exercise some discretion, those are "not the words that Congress wrote, and this Court is not free to 'rewrite the statute' to the Government's liking." *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 123 (2018).

The Department's interpretation is unmoored from the plain meaning of the gainful-employment language in other ways. For instance, while the Department asserts that the text allows it to focus on how program "graduates" are faring in certain post-graduate years, Resp.Br.19, the statute in fact focuses on "students," 20 U.S.C. §§1002(a), (b)(1)(A)(i); *id.* §1088(b)(1)(A)(i)—*i.e.*, those who are currently "enrolled in a school" and "engaged in learning," Random House 1888. That is presumably because schools "control" their students' curriculum but have no "control" over their graduates when they leave school. 84 Fed. Reg. at 31,409. Furthermore, while the Department claims that it may focus exclusively on whether "half" of a school's former students "[a]ctually [o]btain[ed]" sufficiently lucrative

6

jobs, Resp.Br.43, the statute focuses on whether schools are providing "training" programs to "prepare students"—*all* of them, not half—for gainful employment in recognized occupations, not that schools must guarantee that (some subset of) students actually obtain such employment, 20 U.S.C. §§1002(a), (b)(1)(A)(i); *id.* §1088(b)(1)(A)(i). And while the Department theorizes that it may focus on whether typical program graduates have sufficiently lucrative jobs to "repay" loans and to outearn the "typical high school graduate without postsecondary education or training," Resp.Br.2, the statute conspicuously never mentions concepts of repayment nor references any individuals other than current students.

2.      The Department's discussion of "statutory context" is just an appeal to other provisions that it claims authorize it to take "necessary" actions to "protect the interests of the United States" and "the sound administration of the financial aid programs." Resp.Br.23-24 (quoting 20 U.S.C. §§1087d(a)(7), 1094(c)(1)(B)). Those general provisions cannot bear the weight the Department would give them. After all, this Court has consistently rejected this kind of bootstrap argument, expressly rejecting the suggestion that a "grant of authority to promulgate 'necessary' regulations … expand[s] the scope of the provisions the agency is tasked with 'carry[ing] out.'" *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) (second alteration in original). There is no reason to deviate from that approach here. The Title-IV eligibility "depends on whether the

7

relevant" program at a for-profit school prepares students for gainful employment, so it follows that Title-IV eligibility just "turns on the definition of" "gainful employment." *Id.* A contrary "[r]eading"—one that allows boilerplate "catch-all" grants of necessary-and-proper "authority … to justify the Rule"—"would obliterate the directly applicable textual limits" on Title-IV eligibility that Congress itself established. *Airlines for Am. v. DOT*, 110 F.4th 672, 675-76 (5th Cir. 2024).

Meanwhile, the Department has no meaningful responses to the numerous arguments that support Plaintiffs' plain-text reading. The Department asserts that the gainful-employment language has a "single meaning"—*i.e.*, that "typical graduates" of programs at for-profit schools must "obtain employment" that is "profitable in context" several years after graduating, or else those programs cannot qualify as Title-IV-eligible. Resp.Br.32. But as Plaintiffs have pointed out, other language in the HEA explicitly says that for-profit schools can offer gainful-employment programs that qualify as Title-IV-eligible *even if* they have existed for just two years and therefore lack alumni with the supposedly necessary post-graduate statistics. *See* 20 U.S.C. §§1002(b)(1)(E), (c)(1)(C). Confronted with that obstacle, the Department asserts that it will simply "not enforce" the gainful-employment language against "new programs" because it is impossible to collect the supposedly necessary "data" for those programs. Resp.Br.32. But at the same time, the Department argues (correctly) that the gainful-employment language is a

8

"requirement" and "statutory criterion" that *all* programs subject to it *must* satisfy as a precondition to Title-IV participation. Resp.Br.11, 32. The "logical knots into which [the Department] invites us to tie ourselves further confirms that its interpretation is not the best reading of the statute." *Rest. L. Ctr. v. DOL*, 120 F.4th 163, 172-73 (5th Cir. 2024).

In reality, if Congress wanted the Department to focus on post-graduate debt and earnings in this context, it would have used language to that effect—just as it has done in other HEA provisions that apply to different programs and schools. As the Department acknowledges, one provision of the HEA—20 U.S.C. §1087d— codifies "requirements" for programs offering traditional undergraduate and graduate degrees that are "substantively 'nearly identical to the earnings-premium test set forth' in the [2023] Rule." Resp.Br.27. The Department claims there is no "plausible" indication that "Congress would have wanted to require programs offering traditional undergraduate and graduate degrees—but not vocational certificate programs—to meet such earnings-based requirements." Resp.Br.27-28. Of course there is: It is called text. The text of §1087d expressly applies an earnings-premium test *only* to programs offering traditional undergraduate and graduate degrees, and it does so using text specifically directed to that end, not the words "gainful employment." "Here, as in all of law, text is king." *Abbott v. Biden*, 70 F.4th 817, 827 (5th Cir. 2023). And the text of §1087d makes clear beyond cavil that

9

Congress "knows" how to impose a requirement akin to the 2023 Rule and that it uses much different words (850 of them) to do so. *Jama v. ICE*, 543 U.S. 335, 341 (2005). The notion that Congress accomplished the same thing with just two words is fantasy, not economy of language.[2]

Nor does §1087d stand alone. As the Department agrees, the HEA includes other provisions—the "cohort default rate" provisions, *see* 20 U.S.C. §1085(a)(2)(A), (m)(1)—that "specif[y] that an institution is generally ineligible for Title IV funding" if a certain percentage of their graduates have insufficiently remunerative jobs and thus begin "default[ing]" on their loans. Resp.Br.29. In addition, other provisions permit graduates to obtain debt relief if their "debt-to-income ratio[s]" are problematic. 20 U.S.C. §1085(*o*)(2); *see id.* §§1015a(k)(D), 1087dd(e)(1)(A), 1098e(b)(7)(B)(v). The Department downplays those provisions because "they do not discuss gainful employment," which is a "separate" requirement that uses separate language. Resp.Br.29. Exactly. Because "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another," the natural "inference"—"unless we abandon all

---

[2] The Department claims that, in the legislation that produced 20 U.S.C. §1087d, Congress "approv[ed]" the 2023 Rule because it "left it in place." Resp.Br.27-28. That 940-page piece of legislation is silent about the 2023 Rule, and "[d]rawing meaning from silence is particularly inappropriate [when]"—as here—"Congress has shown that it knows how to address an issue in express terms." *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010).

pretense at precise communication"—is that the language in these other provisions is meant to address post-graduate debt and earnings while the gainful-employment language is meant to address something different and antecedent: the provision of in-classroom training oriented toward a paying job in a particular vocation. *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391-92 (2015).

Reinforcing that conclusion, numerous other HEA provisions *specifically* use "gainful employment" language, and in every instance, there is no question that Congress had only a paying job in mind. *See* 20 U.S.C. §§1036(e)(1)(B)(ii), 1134c(a), 1135c(d)(2), 1161g(d)(5)(B). The Department does not disagree with that understanding. Undeterred, the Department proclaims that the gainful-employment language just has a "different meaning" in this single "context." Resp.Br.30-31. But accepting that theory "would violate yet another rule of statutory construction: 'In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning' across a statute." *Lomax v. Ortiz-Marquez*, 140 S.Ct. 1721, 1725 (2020). The Department offers no valid reason why this is "the most unusual situation"—only speculation about what Congress "might" have thought. Resp.Br.30. *But see FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 2026 WL 1686059, at *7 n.5 (U.S. June 11, 2026) ("The judicial task is to read words, not minds."). That is insufficient "to unseat our normal presumption that, when Congress uses a term in multiple places within a single statute, the term bears

a consistent meaning throughout." *Azar v. Allina Health Servs.*, 587 U.S. 566, 576 (2019).

3.     The Department's remaining arguments are weaker still.  Indeed, the Department musters just two snippets of legislative history from 1965 referenced in a district court decision upholding the 2011 Rule under *Chevron* step two.  *See* Resp.Br.25.  As the Supreme Court has explained, "'excerpts from committee hearings' are 'among the least illuminating forms of legislative history.'"  *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019).  And any insight that those snippets provide affirmatively undermines the Department's position.  They emphasize that the definition of "eligible institution" that encompasses vocational schools—*i.e.*, that such schools had to provide "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations"[3]—"was intended" to "be as liberal as possible," except that "fly by night" institutions that had not existed for at least two years "should explicitly be eliminated from eligibility."  S. Rep. No. 89-758, at 12; *see* H.R. Rep.

---

[3] The Department protests Plaintiffs' use of the words "designed to" when discussing the gainful-employment language.  *See* Resp.Br.19, 23. As the Department has previously conceded, however, "the change in the language from requiring that vocationally oriented programs be 'designed to fit individuals for useful employment in recognized occupations,' to the current requirement that they 'prepare students for gainful employment in a recognized occupation,' was not substantive." Gov't.Cross-Mot.for.SJ.at.17, *APSCU v. Duncan*, No. 14-cv-1870 (D.D.C. filed Mar. 6, 2015), Dkt.18.

No. 89-308, at 9.  The Department's approach in the 2023 Rule—stripping Title-IV eligibility from hundreds of longstanding programs while allowing brand-new programs to qualify as Title-IV-eligible because they lack graduates for the Department to evaluate—gets matters exactly backwards.

The Department acknowledges (as it must) that, for nearly half-a-century after the HEA's enactment, it never "impose[d] earnings-related tests based on th[e] [gainful employment] language."  Resp.Br.33.  The Department dismisses those decades of agency inaction as supposedly only relevant in "major questions" cases. *See* Resp.Br.34.  The question here—implicating "billions of dollars," Resp.Br.50, and the shuttering of countless schools—is hardly minor.  But that is immaterial. Instead, "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941).  Courts thus have long considered whether agency interpretations are contemporaneous (or novel) and consistent (or conflicting) when evaluating their persuasiveness, however major (or minor) the question. *See, e.g.*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Loper Bright*, 603 U.S. at 386.  And in numerous contexts, the Supreme Court has observed that the government's reticence in

exercising a "highly attractive" power is critical evidence that it does not exist. *Printz v. United States*, 521 U.S. 898, 905 (1997).

And on this question, there is far more than agency inaction. The Department itself said decades ago that the "statutorily intended goal or result" of the gainful-employment language is simply "preparation for gainful employment in such an occupation"—"not that such a goal or result be potentially derived or incidentally available at the conclusion of the program." *In re Acad. For Jewish Educ.*, 1994 WL 1026087, at *2-3 (Dep't of Educ. Mar. 23, 1994). The Department has also long deployed the phrase "gainful employment in a recognized occupation" in its own regulations and has accepted evidence of paying work as sufficient proof of "gainful employment." *See* 34 C.F.R. §668.8(c), (g)(1)(ii). And in the 2019 Rule, the Department acknowledged that, for decades, it had "enforc[ed] the law" simply by "disallow[ing] proprietary institutions … to offer general studies, liberal arts, humanities, or other programs not intended to prepare students for a named occupation." 84 Fed. Reg. at 31,401. While the Department would prefer to ignore that evidence, it is proof-positive that the 2023 Rule is ahistorical and *ultra vires*.

## II.     The Department's Action Is Arbitrary And Capricious.

That conclusion suffices to dispose of this appeal, but the government fares no better in arguing that the 2023 Rule complies with the APA's arbitrary-and-capricious standard. Contrary to the government's suggestion, *see* Resp.Br.35, that

standard is far from "toothless," but rather "has serious bite," *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022).  The 2023 Rule flunks it four times over.

### A. The Department Illogically Relies on Concededly Inaccurate Earnings Data.

The 2023 Rule hinges on two metrics—the debt-to-earnings and earnings-premium metrics—that in turn rely on federal data purportedly showing the earnings of program graduates, including cosmetology-program graduates.  For years, the Department, courts, and others have recognized that federal earnings data are hopelessly inaccurate with respect to cosmetologists, as the underreporting of tip-income is rife in this cash-heavy field.  That is why even the 2011 and 2014 Rules gave cosmetology schools at least some ability to challenge the earnings data in an appeals process—and partly why the 2019 Rule abandoned an earnings-based test altogether.  *See, e.g.*, 84 Fed. Reg. at 31,409; 79 Fed. Reg. at 64,955; 76 Fed. Reg. at 34,424-25.  Thus, the Department's decision in the 2023 Rule to rely solely on federal earnings data "without an opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting" is arbitrary in the extreme.  88 Fed. Reg. at 70,042.

The Department suggests that Plaintiffs' cosmetology-school-specific argument faces an "uphill battle" because the D.C. Circuit has stated that, "in formulating general rules, 'a regulator need not always carve out exceptions for arguably distinct subcategories of projects.'"  *Finnbin, LLC v. Consumer Prod.*

*Safety Comm'n*, 45 F.4th 127, 135 (D.C. Cir. 2022); *see* Resp.Br.36. But the Department forgets that it decisively *lost* that battle the last time around—when litigating over the 2014 Rule—when it "openly acknowledged that underreporting is an issue" in the "cosmetology" sector but nevertheless engaged in a "wooden" use of federal earnings data and "unjustifiably made appeals difficult to mount." *Am. Ass'n of Cosmetology Schs. v. Devos*, 258 F.Supp.3d 50, 63-64, 73 (D.D.C. 2017). The Department provides no good reason why it should prevail in this rematch when it is engaging in an even more wooden use of federal earnings data and has scrapped an appeals process altogether.

The Department's lead response is that it is appropriate to rely exclusively on federal earnings data because "'individuals are legally required to report their' taxable income and are 'subject to considerable legal penalties' for any failure to do so." Resp.Br.36-37. That is true but irrelevant, as the data universally attest that the possibility of those penalties does not deter underreporting. Indeed, as the district court explained when the Department unsuccessfully pressed this same argument in the litigation over the 2014 Rule, the fact that "underreporters are subject to civil and criminal penalties" if they are caught underreporting is a "non sequitur," as such penalties have demonstrably failed to cure the underreporting problem. *AACS*, 258 F.Supp.3d at 63-64.

The Department tries to get around that barrier here by invoking the "increasingly digitized economy," which supposedly creates additional "records" and an "elevated risk of apprehension in the case of an audit.'" Resp.Br.37-38. But the Department has not supported its assumptions that payment applications like Venmo generate accurate records that solve the underreporting problem or that cosmetologists intent on evading the taxman will perceive any greater risk from noncompliance when the "penalties" remain "the same."[4] *AACS*, 258 F.Supp.3d at 64. As the Supreme Court has admonished, agencies cannot rely on an unexplained "assumption" to satisfy the arbitrary-and-capricious standard. *Ohio v. EPA*, 603 U.S. 279, 293 (2024); *see Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021). That aptly describes what the Department is doing here.

The Department next observes that it "relies extensively on the same 'reported income' data" in other contexts and asserts that it wants "avoid the perverse incentives that would be created by making the rule's application more lenient for

---

[4] The 2023 Rule theorized that a 2021 law requiring payment platforms like Venmo to issue certain tax forms (1099-K forms) whenever an individual earned at least $600 in income on the platform—down from the previous threshold of $20,000—would reduce income underreporting in the "increasingly digitized economy." 88 Fed. Reg. at 70,041. But the IRS never implemented the $600 threshold after 2021, and Congress reinstated the $20,000 threshold in 2025. *See* IRS, *IRS issues FAQs on Form 1099-K threshold under the One, Big, Beautiful Bill; dollar limit reverts to $20,000* (Oct. 23, 2025), https://perma.cc/EQY2-XWLL.

programs in proportion to how commonly their graduates unlawfully underreport their incomes." Resp.Br.37. But using data in different contexts where its inaccuracies are less problematic is no excuse for ignoring glaring inaccuracies in a context where inaccurate data will wrongfully shutter schools whose graduates work in a sector where everyone acknowledges that the data underreport income. Ignoring that substantial underreporting is arbitrary and undermines the Department's stated objectives, as the question that the Department purports to be answering is whether graduates are doing well financially, not whether they are punctilious in tax reporting. And punishing the institutions for the underreporting of their graduates adds a further level of arbitrariness. As the Department itself explained in the 2019 Rule, it is "not the fault of institutions" that graduates underreport income, as schools "do not complete tax returns" for graduates and "cannot guarantee accurate reporting." 84 Fed. Reg. at 31,409.

Despite those statements, the Department now suggests that, when promulgating the 2023 Rule, it found a "lack of underreporting" after reviewing a 2022 study (conveniently funded by a group opposed to for-profit-schools, *see* Opening.Br.48). Resp.Br.37-38. That argument goes nowhere. As Plaintiffs have explained, *see* Opening.Br.48-49, even that biased study determined that tip income remains underreported to the tune of 8-10% and conceded that "underreporting is not limited to tips"—confirming that the overall underreported-income figure is even

18

higher.[5]  ROA.1166.  The Department offers no response.  The 2022 study thus cannot justify the Department's refusal to accommodate income underreporting.

Presumably recognizing as much, the Department suggests that the 2023 Rule includes "safeguards against underestimates of earnings"—*e.g.*, that the Rule measures earnings "approximately one year later" than prior iterations, which will somehow offset "the 8 percent estimate of underreporting." Resp.Br.38.  That theory suffers from multiple flaws.  To reiterate, the underreporting figure is higher than 8% even according to the Department's handpicked studies, and underreporting is endemic, so using a delayed data set does nothing to fix the problem.  And it strains all credulity to suggest that the Rule contains adequate safeguards when virtually every Title-IV-eligible cosmetology program that generates sufficient data is expected to fail and when the Rule eliminates any possibility of an appeal.  *See* Opening.Br.23.  While the government insists that appeals are "neither necessary nor appropriate," Resp.Br.40, it is exceedingly "illogical" to impose the equivalent of the death sentence on schools based on data that no one thinks is accurate and to then eliminate any avenue for a stay of execution, *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019).  That likely explains why Congress mandated appeals

---

[5] The Department also acknowledges that its data contain "statistical noise" that renders the data even more inaccurate.  Resp.Br.39.

when enacting laws that call for something resembling the 2023 Rule. *See* 20 U.S.C. §1087d(c)(5).

**B.      The Department's Earnings-Based Tests Illogically Penalize Schools for Factors Beyond Their Control.**

The 2023 Rule is arbitrary and capricious because its earnings-based metrics penalize schools for factors outside their control. The 2023 Rule blames schools for their graduates' "insufficiently remunerative" jobs, Resp.Br.25, *even if* (for example) graduates themselves value flexibility and choose to work only part-time or not at all, the graduates are affected by historical discrimination that depresses earnings, or those graduates' earnings suffer from unpredictable macroeconomic shocks. In the 2019 Rule, the Department deemed it "absurd" to hold schools accountable for "variables" wholly outside the schools' control. 84 Fed. Reg. at 31,409-10. The Department's about-face here is just as absurd.

The Department denies that it is "punishing" schools that fail the 2023 Rule's metrics, Resp.Br.41, but it previously recognized the opposite. The Department acknowledged that earlier iterations of the gainful-employment rule "harshly" "punished" and "sanction[ed]" schools "for aspects of student debt and earning outcomes that are outside of the institution's control." 84 Fed. Reg. at 31,409-10. The 2023 Rule is no different. As the Rule itself explains, it imposes "sanctions" on schools, 88 Fed. Reg. at 70,099, even as the Department concedes that schools "may

not be able to control their graduates' choices or macroeconomic conditions," Resp.Br.42.

The Department tries to excuse those harsh sanctions on the ground that Plaintiffs and other schools have "chosen to participate in Title IV" and thus must comply with the "gainful-employment requirement." Resp.Br.42. That gets the Department nowhere. The APA is not limited to mandatory agency programs. The Department's theory is that the gainful-employment language "confers substantial discretion" on the Department. Resp.Br.33. If that were correct (and it is not, *see* pp. 4-6, *supra*), then the Department would have a statutory obligation to exercise that discretion in a manner that is not arbitrary and capricious, *see* 5 U.S.C. §706(2)(A). That non-negotiable requirement for lawful agency action does not disappear just because participation in Title IV is not mandatory.

The Department characterizes the 2023 Rule as "reasonable[]" because its "metrics assess only the median debt and earnings of each graduate cohort"—not of all students in the cohort. Resp.Br.43. Previous iterations of the gainful-employment rule did the exact same thing. Nevertheless, as the Department recognized in the 2019 Rule, it is a "nearly impossible task" to "predict macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future" even for the median graduate. 84 Fed. Reg. at 31,417. Indeed, that task is especially daunting for cosmetology

schools, which provide training for students disproportionately likely both to face systematic pay discrimination and to opt out of the workforce for family reasons.

The Department counters that "student demographics alone" do not explain why programs fail the 2023 Rule. Resp.Br.44. True enough, as the Rule is irrational and infeasible in multiple respects. But the bedrock requirements of the APA are not limited to sole causes of injury, and the Department does not dispute that it is holding schools accountable for their graduates' earnings even though it concedes that those earnings (at least partly) reflect historical discrimination for which schools are not responsible. "It is illogical for the rule … to accept" the reality that schools are not responsible for historical discrimination that reduces earnings while "simultaneously" sanctioning schools for those reduced earnings. *Chamber of Com. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023).

The Department argues that it is not faulting schools for "unpredictable" macroeconomic events because the 2023 Rule has "a built-in 'buffer[]' against the effects of economic downturns"—*i.e.*, "any economic downturn would likely affect the earnings of high school graduates even more than postsecondary program graduates." Resp.Br.44. That argument is doubly flawed. First, as the Department seems to agree, this buffer cannot save the debt-to-earnings test, which does not assess the "earnings of high school graduates" at all. *See* Resp.Br.44. Second, the Department is misstating what the 2023 Rule says, which is that "[t]he earnings of

high school graduates … will tend to fall more in economic downturns than will the median earnings of *college graduates*." 88 Fed. Reg. at 70,058 (emphasis added). As Plaintiffs have explained, the Rule's so-called buffer is no buffer at all for schools (like cosmetology schools) that do not produce college graduates. *See* Opening.Br.51. Again, the Department offers no response.

The Department thus is left arguing that it can always "waive or modify regulatory provisions in the future if needed to respond to exceptional circumstances," Resp.Br.45—albeit only after the President of the United States declares a "national emergency," 20 U.S.C. §§1098bb(a)(2)(E), 1098ee(4). But that is just another way of saying that the 2023 Rule blames schools for all manner of events that do not rise to the level of a national emergency, such as a graduate's decision to "take time out of employment or elect part-time work over full-time work to care for children, care for other family members, manage a personal health condition, start a business, or pursue other personal lifestyle choices." 84 Fed. Reg. at 31,413. That is nonsensical.

### C.   The Department Relies on Illogical Debt-to-Earnings Thresholds.

The Department devotes five pages of its submission to defending the purported reasonableness of its "choice to implement debt-to-earnings thresholds of 8% of total earnings and 20% of discretionary earnings." Resp.Br.45-49. That defense is baffling. Only weeks ago, the Department explicitly repudiated any

notion that those very thresholds "accurately distinguish between high-quality and low-quality programs." 91 Fed. Reg. at 21,104-05. Indeed, the Department expressly re-aligned itself with the conclusions of the 2019 Rule, *see id.*, which blasted those 8% and 20% thresholds—which emanate from mortgage-underwriting practices and an academic paper from two economists (Sandy Baum and Saul Schwartz) who never reviewed the gainful-employment language—as "not appropriate" in this context and as lacking "a sufficient, objective, and reliable basis," 84 Fed. Reg. at 31,407. Having reversed field so many times on these issues, the Department is apparently unphased by simultaneously advancing contradictory positions. The Department's willingness to speak out of both sides of its mouth only highlights that the thresholds are arbitrary and capricious in the extreme.

Starting with the 8% threshold, the Department does not dispute that, in the 2023 Rule, it simply copied-and-pasted the justification provided in the 2014 Rule for that figure. The 2014 Rule in turn just cited the Baum & Schwartz paper and then observed (without citation) that "[s]tudies of student debt have accepted the 8 percent standard and some State agencies have established guidelines based on this limit." 79 Fed. Reg. 16,426, 16,443 & nn.50-51 (Mar. 25, 2014). The 2023 Rule does likewise. *See* Resp.Br.48 (stating that the 2023 Rule "uses that [Baum & Schwartz] work" and "explains that other academic work and State regulations also supported the use of an 8% threshold"). That cut-and-paste job is astonishing given

24

that, as the Department explained in the intervening 2019 Rule, the Baum & Schwartz paper "does not support the eight percent threshold, but instead clearly refutes it for the purpose of establishing manageable student loan debt." 84 Fed. Reg. at 31,426. The Department admitted that it "has no empirical basis for the 8 percent threshold" and promised (falsely it turns out) that it would "therefore, no longer use it to determine title IV program eligibility." *Id.* at 31,407.

The Department has no choice but to concede that the 2023 Rule embracing the 8% figure is "contrary to the Department's 2019 conclusion." Resp.Br.48. The Department claims, however, that the change in policy is not "unreasonabl[e]." Resp.Br.48. That theory suffers from all manner of problems, but it suffices for present purposes that an acknowledgment of a change in position (let alone an explanation for the change) appears nowhere in the 2023 Rule itself. That silence is fatal. "When an agency changes its existing position," it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). And contrary to the Department's apparent understanding, those actions cannot come after-the-fact: "We don't evaluate *post-hoc* justifications, given that 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Chamber of Com.*, 85 F.4th at 775 n.17.

That is the end of the road for the debt-to-earnings thresholds, as it is undisputed that a determination that the 8% threshold is arbitrary and capricious suffices to wipe out the 20% threshold too. *See* Opening.Br.54. That is because the 2023 Rule "combines" the 8% and 20% thresholds, "such that a program's graduates must fail both measures for the program to fail the metric." Resp.Br.49. Because the thresholds rise and fall together, the Court need not address the dubious theory that a 20% threshold described by the Department as "ultimately arbitrary" nevertheless satisfies arbitrary-and-capricious review. Resp.Br.47, 49.

## D. The Department's Cost-Benefit Analysis Is Illogical.

Finally, the Department fails to refute Plaintiffs' showing that its cost-benefit analysis is irrational. This Court's precedent is clear: Cost-benefit analysis is an "important aspect of the problem" when agencies regulate, so an agency must "adequately … substantiate[] … benefits and costs" to satisfy the arbitrary-and-capricious standard. *Chamber of Com.*, 85 F.4th at 777. The Department did not fulfill that obligation here.

Start with the 2023 Rule's costs, which the Department barely acknowledges even though they comprise the first half of the cost-benefit equation. As the Department does not dispute, of the 1,270 cosmetology programs now eligible for Title-IV funding, *only 13* are projected to pass the 2023 Rule's tests, while 638 programs enrolling some 80% of students in Title IV-eligible programs are projected

to fail (others skate by only because the Department cannot actually subject them to its tests). *See* Opening.Br.23.

The Department does not come remotely close to adequately explaining where all of those students interested in pursuing training for cosmetology careers will go. The Department suggests that they can enroll in schools that do not participate in Title-IV programs, pointing to studies showing that some cosmetology schools in California and Texas have taken that path. *See* Resp.Br.50-51. But the Department never explains how those programs will benefit students who do not live in those states, and regardless, the Department fails to recognize that the authors of the studies on which it relies "know little about the quality of non-Title IV cosmetology programs." ROA.4957. For all the government knows, it is channeling cosmetology students to *worse* schools. The Department also suggests that failing programs should just "adjust[] their tuition downward." Resp.Br.51. Even setting aside the Department's previous statements that "higher cost" is often "associated with better equipment and facilities, more highly qualified faculty, better quality or more plentiful supplies, and more abundant or convenient student support services," 84 Fed. Reg. at 31,415, the Department does not explain how students who rely on Title-IV aid to finance their education will do so when schools are flatly prohibited from participating in Title-IV programs. And while the 2023 Rule itself suggests that students who rely on Title-IV aid can transfer to "better-performing programs"

27

that continue to maintain Title-IV eligibility, the Department does not defend that reasoning in this Court. And little wonder: The so-called "better-performing programs" are really just those that the Department is incapable of evaluating. *See* Opening.Br.57. The 2023 Rule thus is a recipe to devastate the education system behind the cosmetology sector, which the Department does not dispute is a "bright outlook" sector providing flexible work schedules and immunity for AI-replacement. 84 Fed. Reg. at 31,400.

Against those alarming costs, the Department emphasizes that the 2023 Rule will "save nearly $14 billion in federal funds" as schools are stripped of Title-IV eligibility. Resp.Br.50. As this Court has explained—and as the Department has never acknowledged—when schools are forced to "withdraw from Title IV entirely," it is to "the detriment of students who rely on the availability of" federal student aid, and that is a "consequence" that "harm[s] the public at large." *Career Colls. & Schs. of Tex. v. DOE*, 98 F.4th 220, 255 (5th Cir. 2024). The Department's submission thus does nothing to disturb the conclusion that it has "inadequately substantiated" the costs and benefits of the 2023 Rule. *Chamber of Com.*, 85 F.4th at 777.

## CONCLUSION

This Court should reverse.

28

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ANDREW C. LAWRENCE
KEVIN WYNOSKY
CHADWICK J. HARPER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
[*] Supervised by principals who are members
of the Virginia bar

*Counsel for Plaintiffs-Appellants Ogle School Management LLC; Tricoci University of Beauty Culture, LLC; and American Association of Cosmetology Schools*

June 17, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 17, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

# CERTIFICATE OF COMPLIANCE

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses. June 17, 2026

s/Paul D. Clement
Paul D. Clement